AROCLES AGUILAR, SBN 94753
HELEN M. MICKIEWICZ, SBN 123184
KIMBERLY LIPPI, SBN 185043
Public Utilities Commission
Of The State Of California
505 Van Ness Avenue
San Francisco, Ca 94102
Telephone: (415) 703 5822
Facsimile: (415) 703-4465
kjl@cpuc.ca.gov

Attorneys for Defendants
Michael Picker, Mike Florio,
Carla J. Peterman, Liane M. Randolph
Catherine J.K. Sandoval and Karl Bemesderfer

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NEW CINGULAR WIRELESS PCS, LLC d/b/a AT&T MOBILITY, a Delaware limited liability company; PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA, a California corporation; CALIFORNIA CABLE & TELECOMMUNICATIONS ASSOCIATION, a 501(c)(6) exempt trade association; COMCAST PHONE OF CALIFORNIA, LLC, a Delaware limited liability company; COX CALIFORNIA TELCOM, LLC, a Delaware corporation; CTIA- THE WIRELESS ASSOCIATION®, a District of Columbia non-profit corporation; CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, a Delaware general partnership; MCI COMMUNICATIONS SERVICES, INC., a Delaware corporation,

Plaintiffs,

v.

MICHAEL PICKER, President of the California Public Utilities Commission, in his official capacity; MIKE FLORIO, Commissioner of the

Case No.-3:16-cv-02461(TEH)

**OPPOSITION OF DEFENDANTS MICHAEL PICKER ET AL. TO PLAINTIFFS' APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Date: May 18, 2016
Time: 10:00 a.m.
Court: The Hon. Thelton Henderson

California Public Utilities Commission, in his official capacity; CARLA J. PETERMAN, Commissioner of the California Public Utilities Commission, in her official capacity; LIANE M. RANDOLPH, Commissioner of the California Public Utilities Commission, in her official capacity; CATHERINE J.K. SANDOVAL, Commissioner of the California Public Utilities Commission, in her official capacity; and KARL BEMESDERFER, Administrative Law Judge with the California Public Utilities Commission, in his official capacity,

Defendants.

# TABLE OF CONTENTS

Pages

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3
  A. The Parties ........ 3
  B. The Data ........ 4
  C. Procedural History of the Commission's Investigation ........ 5
  D. The Protective Order ........ 8
  E. CPUC Protection of Confidential Data ........ 10

III. ARGUMENT ........ 12
  A. Plaintiffs Cannot Meet the Standard for a Preliminary Injunction. ........ 12
    1. "Cooperative Federalism" and the Presumption Against Preemption. ........ 12
    2. The CPUC Has the Duty under State Law to Monitor Competition in California, and the Disputed Data is Essential to that Purpose. ........ 14
    3. The FCC Has Not Preempted State Disclosure of Carrier Subscription Data at the Census Block or Tract Level to Qualified Parties in a State Commission Investigation. ........ 16
    4. Carriers Have Not Adequately Alleged a Fourth Amendment Claim. ........ 21
  C. Plaintiffs Have Made No Credible Showing of a Likelihood of Irreparable Harm .. 22
  D. The Public Interest Would Be Harmed by an Injunction in this Case ........ 24

IV. CONCLUSION ........ 25

ATTACHMENT A – CPUC Protective Order, adopted March 3, 2016, modified April 1, 2016.

ATTACHMENT B – 47 CFR 1.7001

# TABLE OF AUTHORITIES

**Page**

## FEDERAL COURT CASES

*Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 103 S. Ct. 1905, 1908 (1983) .......... 24

*Beaver v. Tarsadia Hotels*, 2016 U.S. App. LEXIS 4466 (March 10, 2016) .......... 18

*California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572 (1987) .......... 12

*CBS Corp., et al. v. FCC*, 783 F.3d 699 (D.C. Cir. 2015) .......... 24

*Center for Public Integrity v. FCC*, 505 F.S.2d 106 (D.D.C., 2007) .......... 19

*Cortez v. MTD Prods., Inc*., 927 F.Supp. 386 (N.D. Cal. 1996) .......... 16

*Florida Avocado Growers v. Paul*, 373 U.S. 132, 141 (1962) .......... 18

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed. 2d 914 (2000) .......... 19

*Global NAPs v. CPUC*, 624 F3d 1225 (9th Cir., 2010) .......... 13

*Global NAPs Inc. v. Verizon New England*, 444 F.3d 59 (1st Cir., 2006) .......... 12

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .......... 18

*Lewis v. Younger*, 653 F2d 1258 (1980) .......... 22

*Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355 (1986) .......... 12

*Mt. Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480 (10th Cir. 1998) .......... 16

*Qwest v. Arizona Corp Commission*, 567 F3d 1109 (9th Cir 2009) .......... 19

*Reich v. Montana Sulphur & Chemical Co*., 32 F.d 440 (9th Cir. 1991) .......... 21

*Rice v. Santa Fe Elevator Corp*., 331 U.S. 218 (1947) .......... 12

*Sammartano v. First Judicial District*, 303 F.3d 959 (9th Cir. 2002) .......... 12, 24

*Silkwood v. Kerr-McGee Corp*., 464 U.S. 238 (1984) .......... 12, 17

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) .......... 12, 17

*United States v. Morton Salt Co.,* 338 U.S. 632 94 L. Ed. 401, 70 S. Ct. 357 (1950) .......... 21

*Verizon v. FCC*, 740 F.3d at 623, 638 (D.C. Cir., 2014) .......... 14

## CALIFORNIA COURT CASES

*Consumers Lobby Against Monopolies v. Public Util. Comm'n,* 118 Cal.3d 891, 905-06 (1979) .......... 15

**FEDERAL COMMUNICATIONS COMMISSION DECISIONS**

*In re Lifeline and Link-Up Reform*, FCC 16-38, Third Report and Order (April 27, 2016) ..... 2

*In re Matter of Local Competition and Broadband Reporting, FCC 00-14, Report & Order*, 15 FCC Rcd 7717 (2000) (2000 Reporting Order) ..... 17, 20

*In re Local Competition and Broadband Reporting*, Notice of Proposed Rulemaking, 19 FCCR 7364 (2004) ..... 20

*In re Modernizing the FCC Form 477 Data Program*, FCC 13-87, Report and Order, 28 FCC Rcd 9887 (2013) (2013 Form 477 Order) ..... 5, 17, 19, 20

*In re Special Access for Price Cap Local Exchange Carriers*, Order and Data Collection Protective Order, DA14-1424, 29 FCC Rcd 11657, at ¶ (October l, 2014) ..... 16

*In re Special Access for Price Cap Local Exchange Carriers*, Second Protective Order, 25 FCCR 17725, at ¶¶ 5-6 (2010). ..... 8, 16

**CALIFORNIA STATUTES & REGULATIONS**

Cal. Constitution, Art. XII ..... 3

**FEDERAL STATUTES & REGULATIONS**

47 U.S.C. § 151 *et seq* ..... 12

47 U.S.C. § 224 ..... 13

47 U.S.C. § 254 ..... 13

47 U.S.C. § 322 ..... 22

47 U.S.C. § 1302 (“Section 706”) ..... 14

47 C.F.R. §§ 1.7001-1.7002 ..... 17

**CALIFORNIA PUBLIC UTILITIES CODE**

Pub. Util. Code Section 281 ..... 15

Pub. Util. Code Section 311 ..... 3

Pub. Util. Code Section 314 ..... 3

Pub. Util. Code Section 451 ..... 2

Pub. Util. Code Section 558 ..... 3

Pub. Util. Code Section 581-582 ..... 3

Pub. Util. Code Section 583 ..... 10

Pub. Util. Code Section 584 ..... 3

Pub. Util. Code Section 701 .......... 3
Pub. Util. Code Section 709 .......... 3
Pub. Util. Code Section 709.2 .......... 3
Pub. Util. Code Section 709.5 .......... 3, 14
Pub. Util. Code Section 5960(b) .......... 14, 15

**CALIFORNIA PUBLIC UTILITIES COMMISSION DECISIONS**

D.96-03-020 .......... 14
D.96-12-076 .......... 14
D.97-11-024 .......... 14
D.99-09-029 .......... 14
D.04-09-062 .......... 22
D.06-06-066 .......... 11
D.06-08-030 .......... 2, 14
D.07-05-032 .......... 11
D.08-09-040 .......... 14
D.15-12-031 .......... 22

## I. INTRODUCTION

Defendant California Public Utilities Commissioners (CPUC Commissioners, CPUC, or Commission) respectfully submit this opposition to the Motion of plaintiff telecommunications carriers for a Preliminary Injunction enjoining the CPUC from enforcing the May 3, 2016 Assigned Commissioner and Administrative Law Judge Ruling (AC/ALJ Ruling). The AC/ALJ Ruling granted the Motion to Compel of The Utility Reform Network (TURN), a non-profit, public interest group, and requires production of granular carrier subscription data (sometimes known as "477 data" or "Form 477 data") to TURN, a party to an ongoing CPUC proceeding.

Plaintiffs suggest that the data at issue is simply "Form 477 data," and would have this Court apply a federal framework that governs Form 477 data when states request and receive that data from the Federal Communications Commission (FCC). In fact, the crux of the dispute is not the Form 477 data as received from the FCC, but very specific and granular market share (subscription) data – which includes but is not limited to the 477 data sent by the carriers to the FCC – and a good part of which California law explicitly requires the carriers to produce. The FCC has acknowledged the states' right to ask the carriers directly for such data. The CPUC requested the data directly from plaintiffs in Information Requests appended to the Commission's Order Instituting Investigation 15-11-007 into the State of Competition among Telecommunications Providers in California (OII or Investigation). TURN requested essentially the same data in separate data requests. The AC/ALJ Ruling requires plaintiffs to make this data available to TURN under a strict Protective Order entered in the CPUC proceeding.

Other (non-plaintiff) carrier Respondents have produced the data at issue to TURN in the OII proceeding, and at least one or more plaintiffs have produced some of the data to TURN previously. The question before the Court is whether plaintiffs may be compelled to make that information available to TURN in the context of the competition Investigation, subject to the stringent terms of a Protective Order. Non-profit public interest groups like real party in interest TURN, and two other public interest groups qualified here to obtain the data, regularly review highly confidential documents in Commission proceedings, as explained below. Plaintiffs are

unable to show, and have not shown, any demonstrable harm that has come from any of the present or prior productions, or that might come in the future from this production..

The Commission's Investigation is a matter of public importance. Ten years ago, the Commission largely deregulated the telephone industry in California, on the premise that there was sufficient "intermodal competition" – competition between traditional carriers, wireless carriers, and Voice over Internet Protocol (VoIP) providers – to protect California consumers and produce "just and reasonable" rates. Two years later, the Commission affirmed its earlier decision, and removed the last vestiges of rate regulation for basic telephone service in California. Over the intervening 8-10 years, the world has changed. What was the telephone network, while still providing the basic communications needs for well over 30 million Californians, has evolved into "the essential communications medium of the digital economy."[1] Consumers have more choices, but have the underlying market and network dynamics changed? Does the market work well for urban as well as rural, lower-income as well as affluent, communities? Only the granular market share data at issue here can answer these questions with a necessary level of precision.

Ten years ago, the Commission pledged to remain "vigilant" about whether its experiment was working.[2] To do so is good government.[3] The information at issue part of the "data-driven" exercise which the CPUC has proposed to answer the questions above, and

---

[1] *See In re Lifeline and Link-Up Reform*, FCC 16-38, Third Report and Order (April 27, 2016) (*Broadband Lifeline Order*), at ¶ 12 ("Much like telephone service a generation ago, broadband has evolved into the essential communications medium of the digital economy"), available at http://transition.fcc.gov/Daily_Releases/Daily_Business/2016/db0506/FCC-16-38A1.pdf. The telephone line (as well as the cable line) now provides broadband service, which in turn supports VoIP telephony as well data transmission and access to the Internet. *Id.*, and at ¶ 49, passim.

[2] *See, e.g.*, D.06-08-030, Slip Op. at 156 ("we will remain vigilant in monitoring the voice communications marketplace"), available at http://docs.cpuc.ca.gov/PublishedDocs/WORD_PDF/FINAL_DECISION/59388.PDF.

[3] *Cf.* Pub. Utils. Code § 451 (Commission duty to ensure "just and reasonable" prices, terms, and conditions).

determine the level of competition in the telecommunications market and on the telecommunications network.[4]

## II. BACKGROUND

### A. The Parties

Plaintiffs are largely a group of telecommunications carriers, all of which have one or more affiliates certificated by the California Public Utilities Commission. Additionally, two trade associations – California Cable & Telecommunications Association (CCTA) and "CTIA – the Wireless Association" (CTIA) are listed as named plaintiffs. These associations, though, do *not* represent all cable or wireless companies, or even all of their own members. Sprint, a member of CTIA,[5] has substantially complied with the OII and Rulings of the ALJ and Assigned Commissioner, as has Charter Cable, a members of CCTA.[6]

Defendants are the Commissioners and the ALJ[7] in their role as representatives of the CPUC. The CPUC is a constitutionally-created agency (Cal. Constitution, Art. XII) charged with regulating industries deemed critical to the public welfare, and with securing an affordable, reliable, high-quality, interconnected telephone network for all Californians.[8] In its oversight role, the CPUC has wide-ranging authority to compel the production of information, documents and witnesses.[9] In addition to its authority under state law, the CPUC also has delegated authority under federal law, as described below.

---

[4] OII at 2. The OII is available at http://docs.cpuc.ca.gov/SearchRes.aspx?DocFormat=ALL&DocID=155873962.

[5] http://www.ctia.org/about-us/current-members.

[6] Glegola Declaration, at ¶¶ 6-7.

[7] Plaintiffs have named Administrative Law Judge (ALJ) Karl Bemesderfer as a defendant in this action. CPUC counsel appear specially for ALJ Bemesderfer, do not concede that he was properly named or that this Court has jurisdiction over him, and will move to dismiss him from the action if this matter is not resolved at the Preliminary Injunction hearing.

[8] *See, e.g.*, Pub. Util. Code §§ 558, 709, 709.2, and 709.5.

[9] *See, e.g.*, Pub. Util. Code §§ 311, 314, 581-582, 584, 701.

### B. The Data

It is helpful to identify the underlying data submitted by carriers on the FCC Form 477, and the data at issue here. These are not co-terminous sets.

There are, broadly speaking, three types of Form 477 data reported to the FCC:

- Wireline voice subscription data (both TDM and VoIP),[10] which the FCC then analyzes and presents in its *Local Telephone Competition Report*;[11]
- Fixed broadband deployment and subscription data, which the FCC analyzes and presents in aggregate form in its *Broadband Progress Report*.[12] The FCC also publishes on its website the deployment data in its granular (census block) form;[13] and
- Mobile voice deployment and subscriptions, and mobile broadband deployment (coverage area), service availability (census block), and mobile voice and broadband subscription data, which the FCC analyzes and presents in aggregate form in its *Mobile Wireless Competition Report*.[14] The FCC has stated that it intends to publish the mobile broadband deployment data on its website.[15]

The data the CPUC requested is in several respects different from the Form 477 data. The subscription data sought through OII Information Requests 5-7 includes subscriber information at the census block rather than census tract level (as the FCC requests), the number of "households passed" and "businesses" passed in each census block, and consumer and business subscription numbers by speed tier.[16] This is graphically illustrated in OII Appendices

---

[10] For this and the following two categories, see FCC's Form 477 Instructions (December 31, 2015) at 9, available at https://transition.fcc.gov/form477/477inst.pdf.

[11] *See* https://apps.fcc.gov/edocs_public/attachmatch/DOC-329975A1.pdf (last available report and data, "as of" December 31, 2013).

[12] The latest report was published on January 29, 2016, and is available at http://transition.fcc.gov/Daily_Releases/Daily_Business/2016/db0129/FCC-16-6A1.pdf.

[13] https://www.fcc.gov/general/broadband-deployment-data-fcc-form-477.

[14] *See, e.g.*, https://www.fcc.gov/document/18th-mobile-wireless-competition-report at ¶¶ 17 ff, and Charts II.B.3 ff.; see also ¶ 15 and Table II.B.1 (carrier-specific data).

[15] *See* https://www.fcc.gov/general/broadband-deployment-data-fcc-form-477 ("Mobile Broadband Deployment Overlays Not Yet Available").

[16] *See* OII, Appendix B, Information Requests 5-7 (Toller Declaration, Exhibit 3).

B1-B3, which plaintiffs did not include in their papers.[17] Appendices B1-B3 constitute the Commission's specification of precisely what deployment and subscription data were being requested, some of which were labelled "Form 477 data," while the additional data columns do not bear that rubric. The data requests TURN moved to compel also illustrate that what is called Form 477 data can also be generically described, as they contain no reference at all to the "Form 477."[18] The data both TURN and the Commission have requested are categorically broader and at the same time more granular than what the FCC requests, a fact that plaintiffs acknowledge.[19] As described further below, these data have been produced in past state administrative proceedings, and the FCC acknowledges that states will have ongoing data requests similar but not identical to what the FCC requests with the Form 477.

Another important distinction between the data requested in OII Information Requests 5-7, and the "477 data" which the FCC provides to the CPUC and other states, is timeliness: the last FCC data the CPUC received ran through year-end 2013, whereas the data requested in the OII (and produced by the parties) is "as of" year-end 2015.[20]

Because the FCC has decided to make almost all of the *deployment* data public (except for certain spectrum and speed parameters applicable to mobile broadband deployment only),[21] at issue here is primarily the confidentiality of the *subscription* data in each of these categories: fixed wireline telephony; fixed broadband; and mobile telephony and broadband.

### C. Procedural History of the Commission's Investigation

On November 5, 2015 the Commission issued an Order Instituting Investigation 15-11-007 into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of

---

[17] Compare *Id.* with the online OII, at http://docs.cpuc.ca.gov/SearchRes.aspx?DocFormat=ALL&DocID=155873962.

[18] *See* TURN Data Requests 1-11, found at Lippi Declaration Exhibit 3.

[19] Motion, at 12:5-6 ("at times, at an even more granular level than the FCC requires").

[20] Glegola Declaration, at ¶ 9.

[21] *In re Modernizing the FCC Form 477 Data Program*, FCC 13-87, Report and Order, 28 FCC Rcd 9887 (2013) (2013 Form 477 Order), at ¶¶ 81-82. To the extent the Court is not able to locate FCC Orders, the CPUC can provide them.

Decision 08-09-042 (OII).[22] The OII recounts the history of telecommunications regulation leading to its issuance.[23]

The OII asked the carriers to provide specified data – including the data at issue here -- relating to competitive conditions on the network and in the telecommunications market or markets.[24] Ordering Paragraph 4 of the OII directed the parties "to enter into confidentiality agreements that facilitate the greatest possible sharing of information."

Following service of the OII on November 12, 2016, there has been a substantial amount of motion practice and negotiation between the parties, as described in the Rulings of February 4 and March 4, 2016, and apparent on the Commission's docket sheet (cited above). On March 4, 2016, the ALJ issued an Administrative Law Judge Ruling, addressing the parties' comments on a draft protective order he had circulated, and adopting a final Protective Order, designed to govern the identification, distribution and protection of confidential data in the OII. It addressed seriatim Plaintiff-Respondents' comments by: (a) finding the data asserted to be confidential provided significant information not in the public record; (b) setting up a system of tiered access to competitive data, so that competitors could – if they wished – gain access to Confidential Information through employees or representatives who certified were not involved in Competitive Decision-Making and would not use the data for that purpose, but could only gain access to Highly Confidential Information if they hired outside counsel not involved in the company's Competitive Decision-Making; (c) tentatively adopting a "Commission Only" category for the Form 477 data (and spectrum usage data), relying on the impression conveyed by the carriers that data of this type was not available outside of the FCC and the state commissions, putting "the burden on the Public Interest Intervenors, other Non-Carrier Parties,

---

[22] The docket sheet and administrative procedural history of this matter may be found at https://apps.cpuc.ca.gov/apex/f?p=401:57:0::NO.

[23] OII at 2-10 ("URF Line of Decisions").

[24] The OII itself is found on the Commission's website, as cited above, and as Exhibit 3 to the Declaration of Suzanne Toller. Appendix B to the OII contains a set of Information Requests of the carriers. Those questions were further refined by ALJ Ruling of February 4, 2016 (Toller Decl'n, Exhibit 4. Information Requests 5-7 are primarily those at issue in this case.

and/or competing carriers to show that this data is disseminated outside the FCC and state agencies"[25]; (d) further defining "Confidential Information" and "Highly Confidential Information"; and (e) leaving a handful of other issues to be decided by subsequent order.

Comments on these issues were filed on March 11 by numerous parties, and reply comments on March 14, 2016.[26] Of these, the most significant were filed by TURN, which attached the declaration of its expert Susan Baldwin, detailing numerous occasions that census block level subscription and deployment information had been provided to her, including in her role as a representative of TURN and the Communications Workers of America.[27] The carriers did not contest the accuracy of Ms. Baldwin's statements, but instead argued that the production of Form 477 data by some carriers pursuant to non-disclosure agreements should not bind all carriers.[28] Based on this information, and further research into the underlying nature of the 477 data, the ALJ issued his April 1, 2016 Ruling, which moved the 477 data from the "Commission Only" to the "Highly Confidential" category, and directed the carriers to promptly make that information available to TURN. More motions for reconsideration filed, and – while some of the carriers complied – others, including the plaintiffs here, did not. On April 19, TURN filed a Motion to Compel, and the May 3 AC/ALJ Ruling granted that Motion, *inter alia*.[29]

---

[25] *Id.* at 8.

[26] Comments were filed by Cox California Telecom, LLC, the Consolidated/Surewest/Citizens/Frontier group of carriers, The Utility Reform Network (TURN), and the "Respondent Group" (although their Reply Comments were not served until March 14). Reply Comments were filed by the "Coalition Group" and TURN. In addition, CTIA (The Wireless Association®) filed on March 11 a Further Motion for Expedited Ruling on Modification of Procedural Schedule, which was essentially addressed to the issue of spectrum "use."

[27] Ms. Baldwin's Affidavit is found as Exhibit 2 to the Lippi Declaration, submitted herewith, and is found online as an attachment to TURN's Comments, at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M159/K702/159702158.PDF.

[28] Coalition Group March 15 Reply to TURN Comments, at 8.

[29] The April 19, 2016 Motion is at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M159/K980/159980806.PDF, and the May 3, 2016 Ruling is at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M161/K624/161624646.PDF

### D. The Protective Order

The Protective Order entered by ALJ Bemesderfer is attached to this Opposition as Exhibit A. Like many NDAs and protective orders, the instant Protective Order requires parties seeking access to Confidential and Highly Confidential Information to file an Acknowledgment certifying that they will keep the data confidential, will only file it with the Commission "under seal," will use it only for purposes of this proceeding, and will destroy or return it to the carrier at the end of the proceeding. Violation of this Protective Order's terms is subject to severe sanctions, including disbarment of counsel from practice before the Commission, "financial or non-financial sanctions," as well as further legal action by the Submitting Party.[30]

Paragraph/Section 6 of the Protective Order identifies who can access Highly Confidential Information: Non-Carrier Parties like TURN; and outside counsel and outside consultants for Carrier Parties who certify no involvement with the carrier's Competitive Decision-Making. The latter category is moot at the moment, as there are no pending Acknowledgments from Carrier Parties or other market participants.

The Protective Order is based on similar protective orders adopted by the FCC in its *Special Access* or "business broadband" proceeding,[31] and by the CPUC in its Investigation into the proposed *AT&T/T-Mobile* merger (which in turn was based on the FCC's protective order in that merger proceeding).[32] All three of these protective orders contained two (or three) levels of confidentiality: Confidential; Highly Confidential; and, sometimes, Lawyers Eyes only (capitalization indicating defined terms). None of these other protective orders contain reference to "Commission Only" documents, a category requested by the carriers here, and included in the instant Protective Order but ultimately left unpopulated.

The instant Protective Order combines aspects of Highly Confidential and Lawyers Eyes only protection. While the Protective Order prohibits anyone involved in "Competitive

---

[30] Protective Order, section 15.

[31] *In re Special Access for Price Cap Local Exchange Carriers*, Second Protective Order, 25 FCCR 17725, at ¶¶ 5-6 (2010).

[32] I.11-06-009, docket sheet available here: http://apps.cpuc.ca.gov/apex/f?p=401:56:0::NO:RP,57,RIR:P5_PROCEEDING_SELECT:I1106009.

Decision-Making"[33] from having access to either species of Confidential Information, Highly Confidential Information receives the added protection that no one in-house at a competing carrier can access the documents, even if not involved in Competitive Decision-Making. ALJ Bemesderfer summed up the Protective Order's provisions:

> The "Highly Confidential" category under the Protective Order effectively requires competing carriers to hire outside counsel to review Highly Confidential data, and counsel must file an Acknowledgment of confidentiality and of the duty not to communicate this information to clients, before obtaining access to the data.[34] Unless outside counsel breaches the Protective Order, for which there are severe sanctions, this resolves the concern about confidential or proprietary data falling into the hands of competitors. Outside counsel must also certify that s/he is not involved in "Competitive Decision-Making" for the client, will not use the materials for any purpose other than this proceeding, and will return or destroy the data at the end of the proceeding.[35]

The Protective Order contains a process whereby party representatives, such as TURN's outside expert, who think they qualify are required to file an Acknowledgment of the Protective Order's terms, certifying that they work for a Non-Carrier and are not involved in Competitive Decision-Making. The carriers are given three business days to object to the acknowledging party's access to the information.[36] As described below, Comcast recently objected

---

[33] Competitive Decision-Making" is defined as "advice about or participation in, business decisions or analysis underlying business decisions of the Carrier Party or other communications provider." Protective Order, at A-2.

[34] Protective Order (attached to March 4, 2016 Ruling), at ¶¶ 6, 7-8, and 13. We clarify ¶ 13 by expressing our understanding that only Outside Counsel and Outside Consultants, and representatives of a Non-Carrier Party may sign the part of the Acknowledgement directed to Highly Confidential information. We also note a typographical error in Appendix B (page B-1): "paragraph [8]" should read "paragraph 6."

[35] The FCC goes so far as to contemplate that one outside law firm might give advice to multiple spectrum auction bidders. *See Guidance Regarding the Prohibition of Certain Communications During the Incentive Auction, Auction 1000*, Public Notice, 30 FCC Rcd 10794 (October 6, 2015) (FCC Guidance), at ¶ 15 ("For third parties that may advise multiple licensees on bids or bidding strategies, such as attorneys or auction consultants, firewalls and other compliance procedures should be implemented to help prevent such third parties from becoming conduits for the communication of bids or bidding strategies").

[36] Although it is a moot point here, as no competitors are seeking access to the data, even through special outside counsel, the Protective Order is structured – like the protective orders in the *Special Access and AT&T-T-Mobile* proceedings – so that commercially competing carriers could access the data by hiring special outside counsel who would, in turn, be required to execute the Protective Order's Acknowledgment, certifying that they are not involved in Competitive

(successfully) to the Acknowledgment filed by representatives of the Writers' Guild of America West (WGAW). Although the Protective Order does hold out the possibility that competitors could employ special outside counsel to review each other's Highly Confidential data, that issue is not before the Court, and is moot at this time, both because there is no competitive carrier Acknowledgment pending, and because the carriers have decided (apparently in unison, and unlike the AT&T-T-Mobile and Special Access proceedings) that they will not review each other's confidential information.[37]

**E. CPUC Protection of Confidential Data**

In practice, telecommunications carriers and other utilities may stamp any document or label any information "confidential," at which point the protections of Public Utilities Code § 583 are triggered:

> 583. No information furnished to the commission by a public utility, or any business which is a subsidiary or affiliate of a public utility, or a corporation which holds a controlling interest in a public utility, except those matters specifically required to be open to public inspection by this part, shall be open to public inspection or made public except on order of the commission, or by the commission or a commissioner in the course of a hearing or proceeding. Any present or former officer or employee of the commission who divulges any such information is guilty of a misdemeanor.

Thus, it is a crime for any officer or employee of the CPUC to divulge confidential information without the authorization of the Commission or a Commissioner in the course of a proceeding. Within the context of section 583, the CPUC has, in a number of decisions and resolutions, issued rulings or adopted regulations authorizing the disclosure of, or specifically restricting access to, defined classes of Commission records.[38]

Both in the telecommunications and the energy contexts (to name two of the CPUC's

---

Decision-Making, and would use the data only for purposes of this proceeding. The larger carriers have decided, in lockstep, that they would not seek to review the data in the CPUC's proceeding, in contrast to the *Special Access and AT&T-T-Mobile* proceedings where the competing carriers hired outside counsel.

[37] *See* March 4, 2016 Ruling Adopting Protective Order,

[38] *See, e.g.*, General Order 77-C, D.06-06-66, and Resolution L-436. (Commission decisions, general orders, and resolutions are available on the Commission website, at http://www.cpuc.ca.gov/documents/#DocTypeSearches.

main fields of activity), the Commission has struggled to find a balance between open and broad-based decision-making and the confidentiality of market-sensitive information and trade secrets:

> [T]he challenge we face in our decision today is how to balance the policy goals of public disclosure, full participation and transparency with the statutory provisions allowing and indeed requiring confidential treatment of data in limited instances.
>
> We start with a presumption that information should be publicly disclosed and that any party seeking confidentiality bears a strong burden of proof. Indeed, as discussed below, a party seeking protection of its documents always bears the burden of proof. However, the statutes governing our treatment of confidentiality -- which we note are different from those of our sister energy agency, the California Energy Commission (CEC) – recognize that in some instances (such as "market sensitive" information relating to electric procurement that passes a materiality standard), confidential treatment of data may not only be allowed, but may be required in order to carry out our statutory and constitutional duties. To ensure the best balancing between the broadest disclosure and the narrowest confidentiality, we have developed two appendices to this decision which provide detailed guidance to parties.[39]

In that decision, sometimes known as the *Electric Procurement Data Decision*, the Commission distinguished between market participants ("Carrier Parties" in the parlance of the Protective Order at issue here) and non-market participants like TURN and other consumer groups. In making this distinction, the Commission noted the value of the consumer groups to the process:

> Part of what gives our processes legitimacy is participation from outside groups in our decision making process. With their participation, we consider diverse viewpoints, examine concerns, and develop a fuller record in support of our decisions.[40]
>
> We do not agree that giving non-market participants access to aggregate data is always a full substitute for access to unredacted, detailed information. While there may be ratepayer harm concerns about giving market participants access to the detail (as discussed elsewhere in this decision), there is no basis to restrict non-market participants to receiving only aggregated or redacted information**.**

Consistent with these precepts, the ALJ distinguished between market participants and

---

[39] D.06-06-066, as modified by D.07-05-032, Slip Op. at 2-3.

[40] *Id.* at 58-59.

non-market participants in interpreting and applying the Protective Order. The May 3, 2015 Ruling, among other things, sustains (in large part) Comcast's objections to the Acknowledgment filed by Writers Guild of America, West (WGAW) precisely WGAW is (unlike TURN) involved in commercial negotiations with the carriers or their affiliates.[41]

## III. ARGUMENT

### A. Plaintiffs Cannot Meet the Standard for a Preliminary Injunction.

To prevail on a motion for preliminary injunction, Plaintiffs are required to show (1) probability of success on the merits *and* irreparable injury; or (2) serious questions going to the merits and that the balance of hardships tips sharply in their favor. In addition, the public interest should be given great weight. *See Sammartano v. First Judicial District*, 303 F.3d 959, 965 (9th Cir. 2002). Plaintiffs can meet none of these tests.

### B. Plaintiffs Cannot Succeed on the Merits.

#### 1. "Cooperative Federalism" and the Presumption Against Preemption.

Courts apply a presumption against preemption, except where there is a clear statement to the contrary. *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003). The "powers of the state will not be deemed superseded by Federal legislation within the Federal domain unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). The party claiming preemption bears the "burden to show that Congress intended to [preempt]," and to do so with specificity. *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238, 255 (1984).

The presumption against preemption is especially crucial when the pre-emptive effect of an administrative regulation, rather than a statute, is at issue. *Global NAPs Inc. v. Verizon New England*, 444 F.3d 59, 71 (1st Cir., 2006); *Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 368 (1986) (agency that intends to preempt state regulation must do so clearly and explicitly); *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 583 (1987).

The Federal Telecommunications Act of 1996, Pub. L. 104-104, 100 Stat. 56 (codified as scattered amendments to the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*) inaugurated

---

[41] AC/ALJ Ruling, at 6 ("In contrast to TURN, WGAW does have economic interests at stake in this proceeding, as it is a labor union representing writers, one which negotiates with the content affiliates of Comcast and (potentially) other communications carriers").

a regime of "cooperative federalism," with the FCC interpreting the Act in the first instance, while leaving the states a significant amount of freedom to achieve the ends of the Act within their own state law framework. As the Court said in *Global NAPs*:

> The requirement of a clear indication of the agency's intent to preempt is especially important in the context of the [1996 Telecommunications Act], which "divided authority among the FCC and the state commissions in an unusual regime of 'cooperative federalism,' with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states."

*Global NAPs,* 444 F.3d at 72 (further citations omitted).[42]

Such cooperative federalism, where the CPUC exercises independent state authority within a larger federal framework, is found other areas of telecommunications regulation, including universal service programs,[43] pole attachment rates,[44] and market monitoring and the promotion of competition. The federal rules cited by plaintiffs were promulgated under Section 706 of the 1996 Federal Telecommunications Act,[45] which itself reflects the cooperative federalism embodied in the Act, delegating to both the FCC and state regulatory bodies the authority to monitor and promote competition [for] advanced telecommunications services (aka broadband). Section 706(a) states, in relevant part:

> The Commission *and each State commission with regulatory jurisdiction over telecommunications services* shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) *by utilizing, in a manner consistent with the public interest, convenience and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local*

---

[42] *See also Global NAPs v. CPUC*, 624 F3d 1225, 1228-29, 1234-35 (9th Cir., 2010) (interconnection case decided within federal framework but on the basis of state law); 544 F.3d 1073, 1080 (9th Cir. 2008) (preliminarily upholding state jurisdiction in Medi-Cal/Medicaid "cooperative Federalism" case).

[43] 47 U.S.C. § 254.

[44] 47 U.S.C. § 224.

[45] *See, e.g. 2000 Reporting Order*, at ¶ 3.

> *telecommunications market, or other regulating methods that remove barriers to infrastructure investment.*[46]

While plaintiffs dispute whether this section applies to the CPUC under state law, the point here is that the federal law foresees this parallel jurisdiction. The D.C. Circuit Court has affirmed that this language constitutes a delegation of authority to both the FCC and the state commissions.[47]

### 2. The CPUC Has the Duty under State Law to Monitor Competition in California, and the Disputed Data is Essential to that Purpose.

In 1994, the California Legislature enacted Public Util. Code 709.5 (Stats. 1994, Ch. 1260, Sec. 3), which opened all telecommunications markets under the CPUC's jurisdiction to competition. The CPUC was ordered to ensure that "whatever additional rules and regulations that may be necessary to achieve fair local exchange competition shall be in place no later than January 1, 1997." Pub. Util. Code 709.5(c). In April, 1995, the CPUC instituted a rulemaking process to develop and adopt rules for local exchange competition,[48] and several generations of CPUC decisions articulated an evolving approach to ensuring local telecommunications competition under state law.[49]

California has in fact undertaken its own efforts to monitor and promote broadband, *and has independently required the production of granular deployment and subscription data, including much of the subscription data at issue here,* as part of the "Digital Infastructure and Video Competition Act" (DIVCA):

> (b) Every [digital infrastructure license] holder, no later than April 1, 2008, and annually no later than April 1 thereafter,

---

[46] Codified at 47 U.S.C. § 1302(a), (emphasis added).

[47] *Verizon v. FCC*, 740 F.3d at 623, 638 (D.C. Cir., 2014) ("Congress has granted regulatory authority to state telecommunications commissions on other occasions, and we see no reason to think that it could not have done the same here").

[48] Rulemaking 95-04-043/ Investigation 95-04-044, referred to as "Local Competition Proceeding," and resulting in numerous CPUC Decisions, including D.96-03-020, D.97-11-024, and D.99-09-029. *See also* Open Access and Network Architecture Development proceeding (R.93-04-003 / I.93-04-002) (OANAD); Universal Service proceeding (R.95-01-020/ I.95-01-021).

[49] *Id.*; *see also*, D.96-12-076, 70 CPUC 2d 200, 204 (1996) (modification of prior decision on resale of vertical services "consistent with the requirements of the Federal Telecommunications Act of 1996 … [s]pecifically, Section 251(c)(4)(A)"). This evolution culminated in the Uniform Regulatory Framework, D.06-08-030 and D.08-09-040, discussed above.

> shall report to the commission *on a census tract basis* the following information:
>
> (1) Broadband information:
>
> (A) *The number of households to which the holder makes broadband available in this state*. If the holder does not maintain this information on a census tract basis in its normal course of business, the holder may reasonably approximate the number of households based on information it keeps in the normal course of business.
>
> (B) *The number of households that subscribe to broadband* that the holder makes available in this state.
>
> (C) Whether the broadband provided by the holder utilizes wireline-based facilities or another technology.[50]

In addition, the California Legislature has authorized the Commission to distribute over $300 million of ratepayer money in the California Advanced Service Fund to promote broadband projects where the market has failed and end-users' needs for advanced telecommunications services are "unserved" or "underserved."[51]

It is only logical, then, that California should have its own regime of telecommunications and broadband data collection, and its own confidentiality regimen to go with it. Under section 701 of the Public Utilities Code, the CPUC has authority to do all things "necessary and convenient" in the exercise of its power to supervise and regulate public utilities, "whether specifically designated in this part or in addition thereto …" Under this "expansive authority,"[52] the Commission has engaged in a continuing effort to balance transparency and robust public participation in its processes with the utilities' legitimate need to protect proprietary, confidential, trade secret, and/or other "business sensitive" information. *See* discussion of D.06-06-066 above.

The April 1, 2016 Ruling (Toller Declaration Ex. 4) reflects care in this balancing. In deciding the appropriate level of confidentiality, the Ruling analyzed each datat set separately. It

---

[50] Cal. Pub. Util. Code § 5960(b) (emphasis added).

[51] Cal. Pub. Util. Code § 281.

[52] *Consumers Lobby Against Monopolies v. Public Util. Comm'n*, 118 Cal.3d 891, 905-06 (1979).

assigned the lower level of protection ("Confidential Information") to statewide reporting expressed as a single number. At the other end of the scale was the fixed and mobile broadband subscription data, which is reported to the FCC at the census tract level, and which this Commission has requested at the census block level. It likened this to the "highly detailed or granular customer or geographic information" which was assigned Highly Confidential status in the FCC's *Special Access* proceeding.[53]

The carriers may still contest any party prospectively seeking access to the information by challenging the Protective Order Acknowledgement filed by that party on the ground that such counsel or representatives are in fact, or are likely to be, involved in Competitive Decision-Making. Comcast has in fact challenged one of the Acknowledgments (filed by the Writers Guild of America West), and that challenge was in large part upheld.[54]

The carriers have stated concerns about notice, i.e., whether they would have notice of an impending release of their data, and the ALJ has confirmed that "[n]otice and an opportunity to be heard are provided for in the Protective Order, and are an essential part of the protection of Confidential and Highly Confidential Information."[55]

### 3. The FCC Has Not Preempted State Disclosure of Carrier Subscription Data at the Census Block or Tract Level to Qualified Parties in a State Commission Investigation.

"[T]here is a presumption against preemption" and "state laws should not be superseded except when 'the clear and manifest purpose of Congress' was preemptive." *Cortez v. MTD Prods., Inc*., 927 F.Supp. 386, 388-89 (N.D. Cal. 1996), citing *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). "The party claiming preemption bears the burden of showing with specificity that Congress intended to preempt state law." *Mt. Olivet Cemetery Ass'n v. Salt Lake*

[53] April 1, 2016 Ruling, at 4 (fn 3), and 20 citing *In re Special Access for Price Cap Local Exchange Carriers*, Second Protective Order, 25 FCCR 17725, at ¶¶ 5-6 (2010); *In re Special Access for Price Cap Local Exchange Carriers*, Order and Data Collection Protective Order, DA14-1424, 29 FCC Rcd 11657, at ¶ (October l, 2014), at Appendix B (detailed information, comprising in some instances address-level specific data, where competitive impacts are clear, assigned Highly Confidential category). Among the information that the FCC found justified a "Highly Confidential" designation were the specific locations of special access connections, the specific locations of fiber network routes and nodes, and whether a given connection is owned, leased under an IRU agreement, or obtained as a UNE.

[54] May 3, 2016 AC/ALJ Ruling, at 7-8 (finding that Writers Guild was effectively a market participant).

[55] April 1, Ruling, at 12, citing Protective Order, ¶ 15.

*City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998), citing *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238, 255 (1984).

Federal law can preempt state law only through "express," "field," or "conflict" preemption. *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003). Express preemption occurs where Congress "enacts an explicit statutory command that State law be displaced." *Id.* Field preemption exists where the federal regulatory scheme is "sufficiently comprehensive" that the court can infer that Congress has "occupied the field." *Id.* at 1136. Finally, conflict preemption occurs when there is an "actual conflict" between federal and state law, where "compliance with both federal and state regulation is a physical impossibility" or where state law hinders accomplishment and execution of the federal law's purposes and objectives. *Id.*

As far as the CPUC can discern from plaintiffs' Motion for Preliminary Injunction, the carrier plaintiffs rely on three (or four) sources of federal law, and claimed federal preemption:

- 47 C.F.R. §§ 1.7001-1.7002;[56]
- *In re Matter of Local Competition and Broadband Reporting*, FCC 00-14, Report & Order, 15 FCC Rcd 7717 (*2000 Reporting Order*);
- *Modernizing the FCC Form 477 Data Program*, FCC 13-87, Report and Order, 28 FCC Rcd 9887 (2013) (*2013 Form 477 Order*) (allowing public dissemination of broadband deployment, but not subscription, data); and
- A letter template on an FCC website relating to the FCC provision of 477 data to state representatives.

None of these sources contain a statement, explicit or implied, that states cannot collect carriers' subscription data on their own, under their separate state law authority, and direct that data be shared in state litigation pursuant to strict protections against its public disclosure. There is no express preemption here, and plaintiffs do not claim the contrary.

This is also not a case of field preemption, where Congress has "occupied the field" or "left no room" for supplementary state regulation. Again, plaintiffs do not assert the contrary.

Plaintiffs focus is on conflict preemption.[57] To show such conflict, plaintiffs would have to prove "such actual conflict between the two schemes of regulation [FCC and CPUC data

[56] Application for TRO & Motion for Preliminary Injunction (hereinafter Motion), at 3, citing 47 CFR 1.7001-1.7002. Section § 1.7002 is addressed only to timing and frequency of carrier reporting, while section 1.7001 (found as Attachment B to this Opposition) addresses the substance of the reporting.

collection] that both cannot stand in the same area." *Florida Avocado Growers v. Paul*, 373 U.S. 132, 141 (1962), *citing Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Indeed, the very authority on which plaintiffs base their claim that the instant case is "a textbook case of conflict preemption" again references the presumption *against* preemption:

> Conflict preemption occurs when a state law conflicts with federal law, such that the state law "*stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress*." … Our preemption analysis is driven by the presumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[58]

The CPUC requirement that regulated telecommunications carriers produce information identified in state law, and pursuant to state authority, and to produce that data in the context of a state investigation to public interest advocacy groups in order to promote a robust and informed investigation, while protecting the data with through the Protective Order in place, is fully within "the historic police powers of the States." Plaintiffs do not explain how the sharing of confidential data with non-competitors pursuant to the CPUC's Protective Order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," such that "both cannot stand in the same area." Both FCC's procedures and the CPUC's Protective Order put a high premium on protecting the confidential subscription data of carriers. Both FCC procedures and the CPUC Protective Order are directed toward keeping this confidential data out of the hands of competitors.

Plaintiffs repeatedly cite the language from the FCC acknowledgment letter, that states must have in place "procedural and substantive protections that are equivalent to or greater than those afforded under Federal confidentiality statutes and rules, including the Freedom of Information Act (*see* 5 U.S.C. § 552(b)" and other laws.[59] The FCC's concern here was not with states like California that want to use granular subscription data with appropriate confidentiality protections in state proceedings, but with "states that have 'open records' statutes that may

---

[57] Motion, at 14-18.

[58] *Beaver v. Tarsadia Hotels*, 2016 U.S. App. LEXIS 4466 (March 10, 2016) at *15 (emphasis added, citations omitted).

[59] Motion at 6. 14, 15. We are aware that there are two states that have "open records" statutes that may prevent the state from providing confidential [*7762] protection for sensitive provider information.

prevent the state from providing confidential protection for sensitive provider information."[60] This was precisely the situation in the *Center for Public Integrity* (*CPI*) cited by plaintiffs, where an advocacy group sought virtually *all* the 477 data the FCC had, not within or for the purpose of participating in a state or federal regulatory proceeding, but for its own purposes, with no use restrictions or protective order in place.[61] This was the situation that triggered the Feldman Declaration, cited by plaintiffs.

Here, carriers can comply with both the federal law, by submitting the 477 data to the FCC, and with the state law, by submitting granular subscription data as required by DIVCA, and as directed in the instant CPUC Investigation (where it will be made available to non-market participants per protective order). *Compare Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881, 885, 120 S.Ct. 1913, 146 L.Ed. 2d 914 (2000).

Rather than expressly, or impliedly, preempt such state use of 477 data in ongoing proceedings, the FCC emphasizes that carriers should cooperate with state agencies on telecommunications-related reporting.[62] Plaintiffs rely on *Qwest v. Arizona Corporation Commission* as a leading "conflict preemption" case. *Qwest* was a case originally adjudicated by the Arizona Commission, which in arbitrating the interconnection dispute between Qwest and a competing carrier, added terms to the agreement that had been expressly rejected by the FCC.[63] Contrast that to the permissive stance of the *2000 Reporting Order*:

> *We recognize that various states have implemented local competition reporting requirements and that some of these state programs ask for information similar to that we seek here*. Nothing in the record, however, contradicts our understanding that these state programs are not uniform and differ sufficiently so that carriers serving different states may need to keep multiple sets of records in order to meet similar, but not identical, reporting requirements. We remain convinced that *a properly designed federal program can* ***complement*** *state efforts* and end up reducing

[60] *2000 Reporting Order*, at ¶ 95, citing Texas and Georgia as examples.

[61] *Center for Public Integrity v. FCC*, 505 F.S.2d 106, 117 (D.D.C., 2007)

[62] *2013 Form 477 Order*, at ¶ 31 ("many states have created new offices or agencies focused on broadband deployment issues, or tasked existing offices with such duties, and they potentially continue to play an important role in broadband issues. We encourage providers to continue to work with states on broadband issues").

[63] *Qwest v. Arizona Corp Commission*, 567 F3d 1109 (9th Cir 2009)

the re-porting burdens imposed, overall, on carriers.[64]

Nor is the FCC as categorical or absolute about the "477 data" as plaintiffs claim. The *FCC's 2013 477 Modernization Order* in fact questioned whether *any* of the data should be confidential:

> We find that dissemination of deployment data promotes a more informed, efficient market. By allowing public release of as much of the information as possible, associations, scholars, and others will be able to use the information in their independent analyses of Commission policies, thereby aiding the Commission in crafting regulations that address specific market problems and eliminating those regulations that have outlived their usefulness.[65]

While the FCC distinguished subscription data, which it finds more competitively sensitive, even there the FCC sees reason to make it more broadly available:

> While we do not expand public access to Form 477 subscription data at this time, we delegate authority to the Wireline Competition Bureau, in consultation with the Wireless Telecommunications Bureau, to explore ways to allow greater public access to Form 477 subscription data, and to increase public access to such data if this can be accomplished in a manner that addresses concerns about the competitive sensitivity of the data.[66]

At the outset, the FCC "proposed to make available for public release *all* information collected pursuant to this information collection program,"[67] and then adopted a confidentiality regime "[w]ithout making a prospective decision about what these data elements would satisfy the Commission's standard for non-disclosure."[68] Throughout the years of debate as to the level of confidentiality to be accorded to subscription data,[69] the FCC never prohibited the states from

---

[64] *2000 Reporting Order*, at ¶ 17 (emphasis added).

[65] *2013 Form 477 Order*, at ¶¶ 79-80.

[66] *Id.*

[67] 2000 Reporting Order, at ¶ 86 (emphasis added).

[68] *Id.* at 91-92.

[69] Four years later, the FCC asked whether the confidentiality procedures should be modified "so that the maximum amount of non-competitively sensitive Form 477 information is made publicly available…" *In re Local Competition and Broadband Reporting*, Notice of Proposed Rulemaking, 19 FCCR 7364 (2004). We are not aware that the FCC ever finally resolved this question, so the confidentiality regime of the 2000 Reporting Order appears intact. Cf. Modernizing the FCC Form 477 Data Program,) FCC 13-87, Report and Order, at ¶¶ 78-84

collecting the data and assigning state-specific confidentiality protections to it.

#### 4. Carriers Have Not Adequately Alleged a Fourth Amendment Claim.

Plaintiffs' Fourth Amendment claim suggests a standard for illegal search and seizure that would subject every state agency information request to a federal "relevance" test, and represents another (collateral) attack on the Commission's authority to examine the state of competition in the telecommunications industry.

Plaintiffs cite *Reich v. Montana Sulphur & Chemical Co.*[70] as the leading Ninth Circuit case on the Fourth Amendment's applicability to regulatory information requests – a case in which the Ninth Circuit *upheld* a wide-ranging OSHA subpoena of a chemical company's safety records. Plaintiffs derive a three-point test, to which they would subject every state data request: (1) must be within the agency's authority; (2) must not be "too indefinite"; and must be "reasonably relevant" to the agency's purposes. The Court in *Montana Sulphur* there found that the agency' wide-ranging request for detailed safety information over a period of years[71] was within the agency's authority, not too indefinite, and "reasonably relevant" to the agency's regulatory charge.[72] The Ninth Circuit quotes the *Morton Salt* standard:

> The power of an agency to investigate "is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co., 338 U.S. 632, 642-43, 94 L. Ed. 401, 70 S. Ct. 357 (1950)*. For an agency to subpoena corporate records, "it is not necessary. . . . that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command."[73]

Plaintiffs attempt to turn their Fourth Amendment claim into an attack on the Commission's jurisdiction, suggesting that "VoIP, wireless, and broadband services" are "areas

(June 27, 2013) (allowing public dissemination of broadband deployment, but not subscription, data).

[70] 32 F.3d 440 (9th Cir. 1991).

[71] *Id.* at 443.

[72] *Id.* at 448.

[73] *Id.* at 444-45.

where the Commission "lacks regulatory authority."[74] Aside from the fact that this assertion is incorrect, as discussed above,[75] it is wide of the mark. In a case where the California Attorney General sought documents relevant to an antitrust claim which the target of the investigation claimed was preempted, the Ninth Circuit held:

> The district court's ruling on preemption of the California antitrust laws was premature. By enjoining the Attorney General's investigation at its inception, the district court prevented the Attorney General from conducting an investigation for which there were several proper objectives. *Courts will not presume that information sought by state officials for which there is a legitimate purpose will be put to an unconstitutional use. Natural Gas Pipeline Co. v. Slattery,* [*302 U.S. 300, 309, 58 S. Ct. 199, 203, 82 L. Ed. 276 (1937)*. Even assuming, for the sake of argument, that the California antitrust laws are preempted in their application to the distribution of Alaska natural gas by the Transportation Act and the Gas Act, appellees can properly litigate that issue if and when the Attorney General attempts to enforce the substantive requirements of California law against them after completion of his investigation.[76]

In 2006 and 2008, the CPUC stated that intermodal competition would protect consumers. The carriers seek here to effectively prohibit the Commission from revisiting its own prior reasoning in light of changes in the marketplace.

### C. Plaintiffs Have Made No Credible Showing of a Likelihood of Irreparable Harm

The carrier plaintiffs cannot demonstrate irreparable harm. They submit a handful of identically-captioned declarations, one each for each of the moving party plaintiffs, attesting in each instance to the competitive harm their company would suffer if the data were made public or provided to competitors. But nothing in the Protective Order would do that. At no point do the carriers explain how providing the disputed subscription data to non-commercial parties

---

[74] Motion at 20.

[75] *See* discussion above relating to DIVCA and CASF broadband programs, supra; Pub. Utils. Code § 285 (surcharges assessed on VoIP carriers); see also 47 U.S.C. § 332 (state agency jurisdiction over wireless terms and conditions); D.04-09-062 (Cingular Wireless assessed with $12.1 million penalty and restitution); D.15-12-031 ($24 million in back surcharges and $10 million penalty recovered from TracFone Wireless).

[76] *Lewis v. Younger*, 653 F.2d 1258, 1260 (1980).

which have committed not to share the data with anyone else, and use it only for purposes of this proceeding, equates to making the data public or providing it to competitors.

This glaring defect in plaintiffs' case is made all the more apparent by the unrebutted declaration of TURN's expert witness, Susan Baldwin, submitted after the March 4, 2016 ALJ Ruling, negating the carriers' implicit argument that 477 data was *never* available to parties outside of the FCC and state Commissions. Ms. Baldwin recounts numerous times she has received access to 477-type deployment and subscription data, including Verizon's production of "the total number of broadband connections, or subscriptions, separately by census block" in the recent CPUC proceeding on the Verizon-Frontier merger.[77] Ms. Baldwin further describes how confidential 477 data was provided in the CPUC's Comcast-Time Warmer merger application proceeding, in a Pennsylvania proceeding involving a Verizon petition for competitive classification (in which she testified for the Communications Workers of America), and in similar proceedings in Connecticut and New Jersey. The carriers did not rebut Ms. Baldwin's testimony, and tacitly conceded its accuracy.[78]

Moreover, in the Commission's ongoing OII proceeding, carriers not allied with the plaintiff coalition before the Court – namely Sprint, Frontier, Charter, and possibly others – have substantially complied with the OII Information Requests for census-block subscription data, provided this data to Commission staff, and made it available to TURN and the other non-commercial parties to the Investigation. In other CPUC proceedings, TURN is regularly granted access to highly confidential documents and information, including energy procurement information.[79] Ms. Baldwin, for the National Association of State Utility Counsel & Advisors (NASUCA) received access to even more granular special access or business broadband information in the FCC's ongoing *Special Access* proceeding.[80] In none of these cases or proceedings have the plaintiff carriers found (or presented to the Court) any evidence that their data has leaked to competitors.

---

[77] Baldwin Affidavit, submitted in support of TURN's March 11, 2016 Comments on Protective Order, attached as Exh. 2 to Lippi Decl.

[78] Coalition Group March 15, 2016 Reply to TURN Comments, at 8.

[79] *See* discussion of D.06-06-066 above.

[80] Baldwin Affidavit, at ¶ 17.

Petitioning carriers rely on the recent D.C. Circuit case of *CBS v. FCC* to supply the irreparable harm that does not exist in fact.[81] Though the Court recognized a presumption against disclosure of confidential information, the harm that animated the Court's decision was the fact that the FCC had failed to follow its own policies and regulations relating to the designation of confidential data, and thus failed to overcome this presumption.[82] Moreover, *CBS* involved the potential release of proprietary information belonging to third party content providers apart from, and at cross-purposes with, the communications carriers that were the subject of the merger. It was a battle of marketplace titans who had not "signed up for that exposure…"[83] By contrast, here only the petitioning plaintiffs would be affected by the release of their own information. Even so, the decisive fact in *CBS* was the FCC's failure to follow its own rules. Indeed, the case suggests that had the FCC followed its own procedures, it might in fact have granted access to the information at issue.[84]

**D. The Public Interest Would Be Harmed by an Injunction in this Case**

When issuance of a preliminary injunction will affect non-parties, the court must independently assess the public interest. *See Sammartano, supra*, 303 F.3d at 974. In the present case, the public interest strongly favors the denial of a preliminary injunction.

There is no question that upwards of 30 million of California ratepayers, to say nothing of millions of small and large businesses, rely on a reliable and reasonably priced telecommunications network. "The regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S. Ct. 1905, 1908 (1983). Effective regulation of California public utilities requires the CPUC to be able to investigate concerns about market inefficiency and market power.

---

[81] Motion at 21-22, *citing CBS Corp., et al. v. FCC*, 783 F.3d 699 (D.C. Cir. 2015).

[82] *Id.*, at p. 707.

[83] *Id.*, at p. 701.

[84] *Id.*, at p. 708 ("the Commission always allowed aggrieved parties to seek review at the agency level … before the Bureau could disclose the information").

The CPUC's attempt to document the actual condition of the telecommunications marketplace is of surpassing importance at a time when the network is evolving from "plain old telephone service" (POTS) to an all-purpose electronic network that is the motor of California's digital economy. To limit or further delay the Commission's data-driven review of market conditions, as plaintiffs here seek to do, does not serve the public that increasingly relies on this communications network, every time an ATM machine is used, or a 911 call is placed, or a document is "backed up to the cloud," a network used for political and social discourse and as a key input for the innovation economy, and which also provides telemetry for other essential services such as energy, gas, and water. The telecommunications network is truly the nervous system of California in the 21st century.

## IV. CONCLUSION

As detailed above, plaintiffs cannot demonstrate any likelihood of succeeding on the merits, cannot show irreparable injury, and cannot wish away the public importance of the essential service that they offer. Accordingly, the CPUC respectfully requests that the Court deny plaintiffs motion for a preliminary injunction..

Dated: May 11, 2016

Respectfully submitted,

AROCLES AGUILAR
HELEN M MICKIEWICZ
KIMBERLY LIPPI

By: /s/ KIMBERLY LIPPI

Kimberly Lippi

Attorney for the California Public Utilities Commission

**ATTACHMENT A**

**Protective Order Investigation**

**I.15-11-007**

1. In this Protective Order, we adopt procedures to limit access to confidential information that is served or filed in this proceeding, I.15-11- 007 (OII). We anticipate that parties' access to and discussion of such information will assist in developing a complete record on which to base the Commission's findings, conclusions and decision in this matter. While we are mindful of the potentially sensitive nature of data related to matters in this proceeding, we are also mindful of the right of the parties to participate in this proceeding in a robust and meaningful way, which in turn will help the Commission fulfill its duty to monitor the public communications network. We therefore will make such information available to parties[1] in this proceeding, but only pursuant to this Protective Order. We conclude that the procedures we adopt in this Protective Order give appropriate access to parties while protecting confidential information from improper disclosure, and that the procedures thereby serve the public interest.

2. The Acknowledgement Requirement of this Protective Order does not apply to the Commission's Office of Ratepayer Advocates, as that Office is bound instead by the confidentiality requirements of Pub. Utils. Code § 583 and General Order 66-C. Otherwise, this Protective Order applies to Carrier and to Non-Carrier Parties, as defined below.

3. Definitions: as used herein, capitalized terms shall have the following meanings:

> "Acknowledgement" means the Acknowledgement of Confidentiality attached as **Appendix B** hereto.
>
> "Carrier Parties" mean those telephone corporations and affiliates listed in Ordering Paragraph 3 of the OII, communications providers that subsequently seek and obtain party status in this proceeding, and communications providers that provide information for use in this proceeding even if they do not seek or obtain formal party status.

---

[1] Parties are determined pursuant to Rule 1.4 of the Commission's Rules of Practice and Procedure. See OII at Section 14 and Ordering Paragraph 7.

“Commission Only Information” means Highly Confidential Information or Documents for which no precedent or authority would allow dissemination outside the Commission or other public regulatory bodies, as set forth in **Appendix A.1** of this document. At the current time, we include in **Appendix A.1** only the Form 477 information (and extensions of Form 477 information) required by Information Requests 5-7 of OII Appendix B, except where the FCC has made that data public. Notwithstanding any other provision of this Protective Order, the information and documents referenced in **Appendix A.1** may only be provided to Commission staff, staff may not provide disaggregated data from these documents to anyone outside the Commission, and ORA may only use disaggregated data from Commission Only documents consistent with the Ruling that accompanies this Protective Order.

"Competitive Decision-Making" means that activities, association, or relationship with a Carrier Party or other communications provider, that involves advice about or participation in, business decisions or analysis underlying business decisions of the Carrier Party or other communications provider.

“Confidential Document” means a document containing Confidential Information.

"Confidential Information" means information that is demonstrably confidential, that the Submitting Party after inquiry believes to be unavailable to the public (whether on the Internet, in published reports, or elsewhere), not widely available in the telecommunications industry, and, if revealed, would place the Submitting Party at an unfair business disadvantage.

“Counsel" means In-House Counsel and Outside Counsel of Record.

“Employee” means a person employed by a party to this proceeding or employed by an affiliated entity and who is actively engaged in the conduct of this proceeding, provided that such person is not involved in Competitive Decision-Making.

“Highly Confidential Document” means a document containing Highly Confidential Information.

“Highly Confidential Information” mean a Confidential Document or Information that the Submitting Party has kept strictly confidential, that contains highly detailed or granular customer or geographic information, and that the Submitting Party claims constitutes some of its most sensitive business data, to the extent that it should only be shared with competing Carrier Parties’ Outside Counsel and Consultants who have signed a filed Acknowledgment. Such Highly Confidential Documents and Information are listed and described in **Appendix A.1** to this Protective Order, as the same may be amended from time to time.

"In-House Counsel" means an attorney employed by a party to this proceeding or by an entity affiliated with a party to this proceeding, and who is actively engaged in the conduct of this proceeding, provided that such attorney is not involved in Competitive Decision-Making.

"Non- Carrier Party" refers to either (1) a consumer group or other organizations not representing carriers or Carrier Parties and not engaged in a telecommunications-related business, including employees, outside counsel and outside consultants; or (2) a trade association and its employees, counsel and consultants not involved in the Competitive Decision-Making of any Carrier Party or other communications provider, whether or not that Carrier Party or communications provider is a client or member of the trade association.

"Outside Counsel of Record" or "Outside Counsel" means the attorney(s), firm(s) of attorneys, or sole practitioner(s), as the case may be, representing a party in this proceeding, provided that such attorneys are not employees of the party, and are not involved in Competitive Decision-Making for a Carrier Party or other communications provider. The term "Outside Counsel of Record" includes any attorney representing a Non-Carrier Party in this proceeding, provided that such attorney is not involved in Competitive Decision-Making for a Carrier Party or other California communications provider.

"Outside Consultant" means a consultant or expert retained for the purpose of assisting Counsel or a party in this proceeding, provided that such consultant or expert is not involved in Competitive Decision- Making. The term "Outside Consultant" includes any consultant or expert employed by a noncommercial party in this proceeding, provided that such consultant or expert is not involved in Competitive Decision-Making.

"Redacted Confidential Document" means a copy of a Stamped Confidential Document where the Confidential Information has been redacted.

"Redacted Highly Confidential Document" means a copy of a Stamped Highly Confidential Document where the Highly Confidential Information has been redacted.

"Reviewing Representative" means a party or a party's Counsel, Employee or Outside Consultant who has obtained access to Stamped Confidential Documents or to Stamped Highly Confidential Documents pursuant to paragraphs 5 and 6 of this Protective Order.

"Stamped Confidential Document" means any document, or any part thereof, that contains Confidential Information and that bears the legend (or which otherwise shall have had the legend recorded upon it in a way that brings its attention to a reasonable examiner) "CONFIDENTIAL INFORMATION --

SUBJECT TO PROTECTIVE ORDER IN I.15-11-007." The term "document" means any written, recorded, electronically stored, or graphic material, whether produced or created by the Submitting Party or another person. By designating a document a "Stamped Confidential Document," a Submitting Party certifies that it contains Confidential Information as defined above.

Only those portions of a document containing Confidential Information should be so designated.

“Stamped Highly Confidential Document” means any document, or any part thereof, that contains Highly Confidential Information and that bears the legend (or which otherwise shall have had the legend recorded upon it in a way that brings its attention to a reasonable examiner) "HIGHLY CONFIDENTIAL INFORMATION -- SUBJECT TO PROTECTIVE ORDER IN I.15-11-007." The term "document" means any written, recorded, electronically stored, or graphic material, whether produced or created by the Submitting Party or another person. By designating a document a "Stamped Highly Confidential Document," a Submitting Party certifies that it contains Highly Confidential Information, as defined herein.

"Submitting Party" means a party which produces Confidential Information and/or Highly Confidential Information in response to Information Requests or discovery requests in this proceeding.

4. Submitting Party’s Obligations in Designating Documents. By this Protective Order, the Commission has modified its standing procedures for the submission of information claimed to be confidential (Rule 11.4), in order to facilitate the prompt filing and full exchange of information in this proceeding. When filing such documents, the Submitting Party is not required to file a motion for submission of information and documents under seal. However, the designation of any document or information as Confidential or Highly Confidential shall constitute a representation by the Submitting Party, subject to the Commission’s Rule 1.1, that the Stamped Confidential or Highly Confidential Documents meet the requirements set forth herein for such designations. The Submitting Party’s designation of a document as “Confidential” or Highly Confidential” means that Party is prepared to certify: (1) that the public release of these materials would place the responding carrier at an unfair business disadvantage, and (2) that, after reasonable inquiry, the Submitting Party has no knowledge of the public availability of such information or document, and believes that the information or document is not found in the public record, i.e., is not known to be accessible to the public, whether on responding party’s website, on

the website of the Securities & Exchange Commission or other government agency, in the publicly available reports of those government agencies, in the online or published versions of industry reports, or in other publications available to the public, or a substantial part of the public. Only those portions of a document containing Confidential or Highly Confidential Information should be so designated (consistent with further guidance provided in the adopting Ruling). After meeting and conferring, parties may object to a Submitting Party's designation by written or oral motion.

5. Procedure for Obtaining Access to Confidential Documents and Information under this Protective Order. Only a Non-Respondent Party, Respondent Carrier Party's In-House Counsel, Outside Counsel and Consultants, and other representatives not involved in Competitive Decision-Making may access Stamped Confidential Documents and Confidential Information. Any person seeking access to Stamped Confidential Documents and Confidential Information shall sign and date the Acknowledgment agreeing to be bound by the terms and conditions of the Protective Order; and the party on whose behalf the person seeks such access shall file the Acknowledgment in the proceeding and electronically serve it pursuant to Rule 1.10 of the Commission's Rules of Practice and Procedure. Each Submitting Party may file an objection to the disclosure of its Stamped Confidential Documents or Confidential Information to any such person no later than three business days from the date that the Acknowledgment was filed. Until any such objection is resolved by the assigned Administrative Law Judge or a law and motion Administrative Law Judge, a person subject to an objection from a Submitting Party shall not have access to Stamped Confidential Documents or Confidential Information. The provisions of this paragraph shall not be construed to apply to the Commission or its staff.

6. Procedure for Obtaining Access to Stamped Highly Confidential Documents and Highly Confidential Information. Only a Carrier Party's Outside Counsel of Record, Outside Consultants (including experts) whom they retain to assist them in this proceeding, and the Outside Counsel's and Outside Consultants' employees, may access Stamped Highly Confidential Documents and Highly Confidential Information. For Non-Carrier Parties, only authorized employees and agents who have signed and filed the Acknowledgment may access Stamped Highly Confidential Documents and Highly Confidential Information. Any person seeking access to Stamped Highly Confidential

Documents and Highly Confidential Information shall sign and date the Acknowledgment agreeing to be bound by the terms and conditions of the Protective Order; and the party on whose behalf the person seeks such access shall file the Acknowledgment in the proceeding and electronically serve it pursuant to Rule 1.10 of the Commission's Rules of Practice and Procedure. Each Submitting Party may file an objection to the disclosure of its Stamped Highly Confidential Documents or Highly Confidential Information to any such person no later than three business days of the date that the Acknowledgment was filed. Until any such objection is resolved by the assigned Administrative Law Judge or a law and motion Administrative Law Judge, a person subject to an objection from a Submitting Party shall not have access to Stamped Highly Confidential Documents or Highly Confidential Information. The provisions of this paragraph shall not be construed to apply to the Commission or its staff.

7. Use of Confidential Information and Highly Confidential Information. Persons obtaining access to Confidential Information (including Stamped Confidential Documents) or Highly Confidential Information (including Stamped Highly Confidential Documents) under this Protective Order shall use the information solely for the preparation and conduct of this proceeding before the Commission and any subsequent judicial proceeding arising directly from this proceeding and, except as provided herein, shall not use such documents or information for any other purpose, including without limitation business, governmental, or commercial purposes, or in other administrative, regulatory or judicial proceedings. The provisions of this paragraph shall not be construed to apply to the Commission or its staff.

8. Permissible Disclosure. A Reviewing Representative may discuss and share the contents of the Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information with another Reviewing Representative who has obtained access to such documents pursuant to this Protective Order and with the Commission and its staff (subject to applicable ex parte rules). A Submitting Party's Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information may also be disclosed to Employees and Counsel of the Submitting Party. Subject to the requirements of paragraph 7, a Reviewing Representative may disclose Stamped Confidential Documents and Confidential Information to: (1) paralegals or other employees

of such Reviewing Party assisting them in this proceeding; and (2) employees of third-party contractors of the Reviewing Party involved solely in one or more aspects of organizing, filing, coding, converting, storing, or retrieving documents or data or designing programs for handling data connected with this proceeding, or performing other clerical or ministerial functions with regard to documents connected with this proceeding. An outside Reviewing Representative of a Carrier Party may only disclose Stamped Highly Confidential Documents and Highly Confidential Information to other outside representatives of a Carrier Party who themselves have signed a filed Acknowledgement, certifying that they are an Outside Counsel, Outside Consultant, or employee of same. A Reviewing Representative of a Non-Carrier Party may not disclose Stamped Highly Confidential Documents or Highly Confidential Information to anyone besides the Submitting Party, the Commission and its staff, employees of the Non-Carrier Party, and other Non-Carrier Party Reviewing Representatives or Outside Consultants who have signed the appropriately filed Acknowledgment.

9. Filings with the Commission. A party may in any document that it files in this proceeding disclose Confidential Information or Highly Confidential Information, and may attach Stamped Confidential Documents or Stamped Highly Confidential Documents to such filing, only if it files the Confidential Information or Highly Confidential Information (and attachments) under seal. Such filings shall employ the form of cover page attached hereto as Appendix C. A party may make one Confidential/Highly Confidential filing, in addition to its public filings, rather than make separate Confidential and Highly Confidential filings. The Confidential/Highly Confidential filing may be served on Outside Counsel or a Non-Carrier Party pursuant to paragraph 6 above. (Outside Counsel may redact the Highly Confidential data and provide to inside counsel, who has signed appropriate Acknowledgment.) For purposes of these proceeding only, parties are relieved of the Rule 11.4 requirement to file a motion seeking confidential treatment for Confidential and Highly Confidential Information (and attached Stamped Confidential Documents or Stamped Highly Confidential Documents, if any).

10. Service of Documents Containing Stamped Confidential and Highly Confidential Data. Parties shall serve documents containing Stamped Confidential and Stamped Highly Confidential Data or attachments of Stamped Confidential and Stamped Highly

Confidential Documents, only on those Reviewing Representatives that have signed the appropriately filed Acknowledgement. Parties serving documents containing such Information shall only be obligated to produce two versions of their documents: a Confidential/Highly Confidential version, and a redacted public version. The Confidential/Highly Confidential filing may be served on Outside Counsel or a Non-Carrier Party pursuant to paragraph 6 above. (Outside Counsel may redact the Highly Confidential data and provide to inside counsel, who has signed appropriate Acknowledgment.) The Submitting Party shall serve the public redacted version on all parties to the proceeding, as listed in the Commission's official Service List.

11. Non-Disclosure of Stamped Confidential Documents and Stamped Highly Confidential Documents. Except with the prior written consent of the Submitting Party, or, after notice to the Submitting Party and opportunity to be heard, upon further order or ruling of the Commission, the assigned Commissioner, the assigned Administrative Law Judge, or a law and motion Administrative Law Judge, neither a Stamped Confidential Document nor any Confidential Information, nor a Stamped Highly Confidential Document, nor any Highly Confidential Information may be disclosed further.

12. Protection of Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information. A Reviewing Representative shall have the obligation to ensure that access to Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information is strictly limited as prescribed in this Protective Order. A Reviewing Representative shall further have the obligation to ensure that Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information are used only as provided in this Protective Order.

13. Client Consultation. Nothing in this Protective Order shall prevent or otherwise restrict Counsel from rendering advice to their clients relating to the conduct of this proceeding and any subsequent judicial proceeding arising therefrom and, in the course thereof, relying generally on examination of Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, or Highly Confidential Information; provided, however, that in rendering such advice and otherwise

communicating with such client, Counsel shall not disclose Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, or Highly Confidential Information, unless the client representative has signed an Acknowledgement pursuant to the restrictions in this Protective Order and is not involved in Competitive Decision-Making. Nothing in this paragraph shall be interpreted as authorizing counsel involved in Competitive Decision-Making to have access to Confidential Information, Stamped Confidential Documents, Highly Confidential Information or Stamped Highly Confidential Documents.

14. No Waiver of Confidentiality. Disclosure of Confidential Information, Stamped Confidential Documents, Highly Confidential Information or Stamped Highly Confidential Documents as provided herein by any person shall not be deemed a waiver by any Submitting Party of any privilege or entitlement to confidential treatment of such Confidential Information, Stamped Confidential Documents, Highly Confidential Information or Stamped Highly Confidential Documents. Reviewing Representatives, by viewing this material, agree: (1) not to assert any such waiver; (2) not to use Confidential Information, Stamped Confidential Documents, Highly Confidential Information or Stamped Highly Confidential Documents to seek disclosure in any other proceeding; and (3) that accidental disclosure of Confidential Information, Stamped Confidential Documents, Highly Confidential Information or Stamped Highly Confidential Documents by a Submitting Party or any receiving party shall not be deemed a waiver of any privilege or entitlement as long as the Submitting Party takes prompt remedial action.

15. Subpoena by Courts, Departments, or Agencies. If a court, or a federal or state department or agency issues a subpoena for or orders the production of Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, or Highly Confidential Information that a party has obtained under terms of this Protective Order, such party shall promptly notify each Submitting Party of the pendency of such subpoena or order. Consistent with the independent authority of any court, department or agency, such notification must be accomplished such that the Submitting Party has a full opportunity to oppose such production prior to the production or disclosure of any Stamped Confidential Document, Confidential Information, Stamped Highly Confidential Document, or Highly Confidential Information.

16. Violations of Protective Order. Should a Reviewing Representative violate any of the terms of this Protective Order, such Reviewing Representative shall immediately convey that fact to the Commission and to the Submitting Party. Further, should such violation consist of improper disclosure of Confidential Information or Highly Confidential Information, the violating person shall take all necessary steps to remedy the improper disclosure. The Commission retains its full authority to fashion appropriate sanctions for violations of this Protective Order, including but not limited to suspension or disbarment of Counsel from practice before the Commission, forfeitures, cease and desist orders, denial of further access to Confidential Information or Highly Confidential Information in this or any other Commission proceeding, and other financial or non-financial sanctions. Nothing in this Protective Order shall limit any other rights and remedies available to the Submitting Party at law or in equity against any person using Confidential Information or Highly Confidential Information in a manner not authorized by this Protective Order. The Parties acknowledge and agree that any violation or threatened violation of this Agreement may be enjoined and restrained by an order of this Commission or a court of competent jurisdiction, and that irreparable injury may be presumed for that purpose.

17. Termination of Proceeding. The provisions of this Protective Order shall not terminate at the conclusion of this proceeding. Within two weeks after conclusion of this proceeding and any administrative or judicial review, Reviewing Representatives shall destroy or return to the Submitting Party Stamped Confidential Documents and Stamped Highly Confidential Documents and all copies of the same. No material whatsoever derived from Stamped Confidential Documents or Stamped Highly Confidential Documents may be retained by any person having access thereto, except Counsel and/or Outside Counsel may retain, under the continuing strictures of this Protective Order, two copies of pleadings (one of which may be in electronic format) prepared in whole or in part by that counsel, and that contain Confidential Information or Highly Confidential Information. All Counsel shall certify compliance with these terms and shall deliver such certification to Counsel for the Submitting Party not more than three weeks after conclusion of this proceeding. The provisions of this paragraph regarding retention of Stamped Confidential Documents, Stamped Highly Confidential Documents, and copies of the same, and Confidential Information and Highly Confidential Information shall not apply to the Commission or its

staff, although such Documents and Information will continue to be protected by Public Utilities Code § 583 and General Order 66-C.

**APPENDIX A.1**

**"Commission Only" Information and Documents**

As specified in this Protective Order, the Commission "Commission Only Information" means Highly Confidential Information or Documents for which no precedent or authority would allow dissemination outside the Commission or other public regulatory bodies. At the current time, we include in this category only the following document:

[Tentatively contained 477 subscription data; moved to Highly Confidential Information by April 1, 2016 Ruling]

**APPENDIX A.2**

**Highly Confidential Information and Documents**

As specified in this Protective Order, only information and documents set forth in this Attachment, and that otherwise meet the definition of Highly Confidential Information or Highly Confidential Documents may be designated as Highly Confidential. This Appendix is currently empty, and will be updated as necessary.

[Per April 1, 2016 Ruling: contains 477 subscription data; wireless carrier spectrum use data; and special access backhaul to wireless cell cites]

**APPENDIX B**

**Acknowledgment of Confidentiality Investigation 15-11-007**

I hereby acknowledge that I have received and read a copy of the foregoing Protective Order in the above-captioned proceeding, and I understand it. I agree that I am bound by the Protective Order, as it may be modified from time to time consistent with paragraph 1 above (particularly as to Appendices A.1 and A.2), and that I shall not disclose or use Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, or Highly Confidential Information except as allowed by the Protective Order.

I acknowledge that a violation of the Protective Order is a violation of an order of the California Public Utilities Commission.

I certify that I am not involved in Competitive Decision-Making.

Without limiting the foregoing, to the extent that I have any employment, affiliation, or role with any person or entity other than a conventional private law firm (such as, but not limited to, a lobbying or advocacy organization), I acknowledge specifically that my access to any information obtained as a result of the Protective Order is due solely to my capacity as Counsel or Outside Consultant to a party or as a person described in paragraph [8] of the foregoing Protective Order and agree that I will not use such information in any other capacity.

I certify that I have verified that there are in place procedures at my firm or office to prevent unauthorized disclosure of Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Protective Order.

[Fill in and initial the following as appropriate]: I certify that I seek access to Confidential Information, Stamped Confidential Documents, Highly Confidential Information, and/or Stamped Highly Confidential Documents on behalf of the following party: __

and in the following role:

______ In-house Counsel or Employee of a Respondent Carrier Party identified above, or a Carrier Party representative described in paragraph 4 of the Protective

Order, seeking access to Stamped Confidential Documents and Confidential Information only.

_____ Outside Counsel or Outside Consultant retained by the Respondent Carrier Party identified above, or an employee of such Carrier Party's Outside Counsel or Outside Consultant, as described in paragraph 5 of the Protective Order, seeking access to Stamped Confidential Documents, Confidential Information, Stamped Highly Confidential Documents, and Highly Confidential Information.

______ Representative of, a Non-Carrier Party, including but not limited to Counsel, Outside Consultant and Employee of that Non-Carrier Party.

Executed this_day of_, 2016.

____________________________________

[Name]
[Position and Company]
[Address]
[Telephone]

**ATTACHMENT B**

**Section 1.7001 states:**

§ 1.7001 Scope and content of filed reports.

(a) Definitions. Terms used in this subpart have the following meanings:

(1) Facilities-based providers. Those entities that provide broadband services over their own facilities or over Unbundled Network Elements (UNEs), special access lines, and other leased lines and wireless channels that the entity obtains from a communications service provider and equips as broadband.

(2) Own facilities. Lines and wireless channels the entity actually owns and facilities that it obtained the right to use from other entities as dark fiber or satellite transponder capacity.

(3) One-way broadband lines or wireless channels. Lines or wireless channels with information carrying capability in excess of 200 Kbps in at least one direction, but not both.

(4) Own facilities. Lines and wireless channels the entity actually owns and facilities that it obtained the right to use from other entities as dark fiber or satellite transponder capacity.

(b) All commercial and government-controlled entities, including but not limited to common carriers and their affiliates (as defined in 47 U.S.C. 153 (1)), cable television companies, fixed wireless providers, terrestrial and satellite mobile wireless providers, utilities and others, that are facilities-based providers, shall file with the Commission a completed FCC Form 477, in accordance with the Commission's rules and the instructions to the FCC Form 477, for each state in which they provide service.

(c) Respondents identified in paragraph (b) of this section shall include in each report a certification signed by an appropriate official of the respondent (as specified in the instructions to FCC Form 477).

(d) Respondents may make requests for Commission non-disclosure of provider-specific data contained in FCC Form 477 under § 0.459 of this chapter by so indicating on Form 477 at the time that the subject data are submitted. The Commission shall make all decisions regarding non-disclosure or provider-specific information, except that the Chief of the Wireline Competition Bureau may release provider-specific information to a state commission provided that the state commission has protections in place that would preclude disclosure of any confidential information.

(e) Respondents identified in paragraph (b) of this section shall file a revised version of FCC Form 477 if and when they discover a significant error in their filed FCC Form 477. For counts, a difference amounting to 5 percent of the filed number is considered significant. For percentages, a difference of 5 percentage points is considered significant.

(f) Failure to file the FCC Form 477 in accordance with the Commission's rules and the instructions to the Form 477 may lead to enforcement action pursuant to the Act and any other applicable law

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **OPPOSITION OF DEFENDANTS MICHAEL PICKER ET AL. TO PLAINTIFFS' APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; DECLARATION OF KIMBERLY LIPPI IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; and DECLARATION OF THOMAS GLEGOLA IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **May 11, 2016.**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ ROSCELLA V. GONZALEZ

Roscella V. Gonzalez