MICHAEL K. KELLOGG (Appearance *pro hac vice*)
SCOTT HARRIS ANGSTREICH (Appearance *pro hac vice*)
KELLOGG HUBER HANSEN TODD EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
Email: mkellogg@khhte.com
sangstreich@khhte.com

*Attorneys for Plaintiffs New Cingular Wireless PCS, LLC d/b/a AT&T Mobility and Pacific Bell Telephone Company d/b/a AT&T California*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NEW CINGULAR WIRELESS PCS, LLC d/b/a AT&T MOBILITY, a Delaware limited liability company; PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA, a California corporation; CALIFORNIA CABLE & TELECOMMUNICATIONS ASSOCIATION, a 501(c)(6) exempt trade association; COMCAST PHONE OF CALIFORNIA, LLC, a Delaware limited liability company; COX CALIFORNIA TELCOM, LLC, a Delaware corporation; CTIA – THE WIRELESS ASSOCIATION®, a District of Columbia non-profit corporation; CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, a Delaware general partnership; MCI COMMUNICATIONS SERVICES, INC., a Delaware corporation,

Plaintiffs,

vs.

MICHAEL PICKER, President of the California Public Utilities Commission, in his official capacity; MIKE FLORIO, Commissioner of the California Public Utilities Commission, in his official capacity; CATHERINE J.K. SANDOVAL, Commissioner of the California Public Utilities Commission, in her official capacity; CARLA J. PETERMAN, Commissioner of the California Public Utilities Commission, in her official capacity; LIANE M. RANDOLPH, , Commissioner of the California Public Utilities Commission, in her official capacity; and KARL BEMESDERFER, Administrative Law Judge with the California Public Utilities Commission, in his official capacity,

Defendants.

Case No. 3:16-cv-02461-VC

**COMBINED REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND IN RESPONSE TO THE OPPOSITIONS OF DEFENDANTS AND TURN**

Date: May 18, 2016
Time: 10:00 a.m.
Place: Courtroom 4, 17th Floor
Judge: Honorable Vince Chhabria

Complaint Filed: May 5, 2016

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ........ 2

A. Requiring Sharing of Form 477 Data With Third Parties Directly Conflicts With the FCC's Rules And Thus Is Preempted. ........ 3

B. The Fourth Amendment Likewise Bars Defendants from Enforcing the May AC/ALJ Ruling. ........ 8

III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION. ........ 11

IV. THE BALANCE OF EQUITIES FAVORS PLAINTIFFS AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST. ........ 15

V. CONCLUSION ........ 17

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Beaver v. Tarsadia Hotels*,
816 F.3d 1170 (9th Cir. 2016) ..........4

*Briscoe v. Bank of Commonwealth of Ky.*,
36 U.S. 257 (1837) ..........6

*CBS Corp. v. FCC*,
785 F.3d 699 (D.C. Cir. 2015) ..........2, 11, 12

*CBS v. FCC*,
No. 14-1242, Order (D.C. Cir. Nov. 21, 2014) ..........2, 15

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
840 F.2d 701 (9th Cir. 1988) ..........11

*City of L.A. v. Patel*,
135 S. Ct. 2443 (2015) ..........8

*Farina v. Nokia Inc.*,
625 F.3d 97 (3d Cir. 2010), *cert. denied*, 132 S. Ct. (2011) ..........6, 8

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ..........4

*Free v. Bland*,
369 U.S. 663 (1962) ..........7

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) ..........4, 6, 8

*Grandbouche v. Clancy*,
825 F.2d 1463 (10th Cir. 1987) ..........9

*Hawkins v. St. Clair Cnty.*,
No. CIV. 07-142-DRH-CJP, 2008 WL 4279994 (S.D. Ill. Sept. 17, 2008) ..........9

*International Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ..........6

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ..........16

*Lewis v. Younger*,
653 F.2d 1258 (9th Cir. 1980) ..........10

*Major League Baseball v. Crist*,
331 F.3d 1177 (11th Cir. 2003) ..........9

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................16

*Napa Valley Publ'g Co. v. City of Calistoga*,
225 F. Supp. 2d 1176 (N.D. Cal. 2002) ....................11

*Qwest Corp. v. Arizona Corp. Comm'n*,
567 F.3d 1109 (9th Cir. 2009) ....................4, 5, 7, 8

*Reich v. Montana Sulphur & Chem. Co.*,
32 F.3d 440 (9th Cir. 1994) ....................8, 9, 10

*See v. City of Seattle*,
387 U.S. 541, 544 (1967)....................9

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) ....................11

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) ....................4

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950)....................8, 9, 10

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1026 (9th Cir. 2013) ....................16

**Constitutional Provisions**

U.S. Const. amend. IV .................... *passim*

U.S. Const. article VI, cl. 2 .................... *passim*

**Statutes**

47 U.S.C. § 155(c)(3)....................3

5 U.S.C. § 552 ....................12

**Regulations**

47 C.F.R. § 1.7001(d)(4)(i) ....................3

**Other Authorities**

Chad DeVeaux, *A Tale of Two Searches: Intrusive Civil Discovery Rules Violate the Fourth Amendment*, 46 Conn. L. Rev. 1083, 1092-1101 (2014) .................... 10i

FCC Form 477 Instructions
(*available at* https://transition.fcc.gov/form477/477inst.pdf)....................7

**Administrative Decisions**

*In re Local Competition & Broadband Reporting*,
15 FCC Rcd. 7717 (2000) .......... 13

*In re Providing Eligible Entities Access to Aggregate Form 477 Data*,
25 FCC Rcd. 5059 (2010) .......... 3, 12

*Modernizing the FCC Form 477 Data Program*,
28 FCC Rcd. 9887, 9922 n.207 (2013) .......... 7, 8

*In re Special Access for Price Cap Local Exchange Carriers*,
29 FCC Rcd. 11657 (2014) .......... 12, 13

*In re Special Access for Price Cap Local Exchange Carriers*,
29 FCC Rcd. 11663 (2014) .......... 12

*In re Special Access for Price Cap Local Exchange Carriers*,
29 FCC Rcd. 11673 (2014) .......... 13

Plaintiffs[1] respectfully submit this combined reply memorandum in further support of their motion for a preliminary injunction and in response to the oppositions of Defendants and TURN.

## I. INTRODUCTION

The FCC has repeatedly explained that Form 477 data is confidential, competitively sensitive information that service providers protect from disclosure. As a result, the FCC has ruled that state commissions must follow strict procedures governing the handling of such information, including the requirement that Form 477 data ***will not be shared*** with persons who are not direct employees of that state commission.

Defendants' assertion that *the CPUC* needs the data in question is irrelevant. For purposes of this case, Plaintiffs do not question whether the CPUC can *collect* Form 477 data: The CPUC has already collected that data, including from Plaintiffs. Instead, this case is about whether Defendants can force Plaintiffs to *share* their Form 477 data with third parties, including TURN. As the FCC has repeatedly directed, Defendants may not do so. Nor are they free to disregard the FCC's rules under the theory that California should have "its own confidentiality regimen" (Def. Br. at 15) that allows the CPUC to perform its own "balanc[ing]" of the relevant interests, *id.* That is the essence of the supremacy of federal law. Because Defendants' directive that Plaintiffs must share their Form 477 data with third parties directly conflicts with, and stands as an obstacle to, the accomplishment of the FCC's rules and policies, it is preempted. Making matters worse, the forced-sharing mandate independently violates Plaintiffs' Fourth Amendment rights.

Equally unavailing is Defendants' assertion that this case is not really about Form 477 data. The CPUC, the ALJ, and TURN have repeatedly stated that the data sought is precisely the same as that submitted by the carriers in Form 477—plus additional, more granular forms of the same data. Plaintiffs are likely to succeed on the merits of their claims.

Defendants' efforts to distinguish *CBS*—in which the D.C. Circuit enjoined an FCC order directing companies to share their confidential programming agreements with other participants in a regulatory proceeding, pursuant to a stringent protective order—highlight their failure to come to

[1] The same abbreviations used in Plaintiffs' opening brief will be used in this reply memorandum.

grips with Plaintiffs' showing of irreparable harm. As the D.C. Circuit explained, once confidential data is ordered produced, "the cat is out of the bag," *CBS Corp. v. FCC*, 785 F.3d 699, 708 (D.C. Cir. 2015) (quotation marks omitted), and there is no way to remedy that harm. The primary and imminent harm here is the forced disclosure of confidential information to third parties—in violation of Plaintiffs' right under federal law not to disclose—prior to a judicial determination on the merits of Plaintiffs' claims. A preliminary injunction is thus needed to maintain the status quo pending that judicial determination. While this form of irreparable injury does not depend on a showing by Plaintiffs that their confidential information will be used to their competitive detriment, the FCC has recognized that *any* production of sensitive data to a third party inherently risks inadvertent disclosure. The FCC has therefore built in additional stringent safeguards against such inadvertent disclosure—protections the CPUC has not adopted.

Finally, the balance of harms decisively tips in favor of a preliminary injunction. As in *CBS*, the regulator (here, the CPUC) possesses the information at issue and may use it. *CBS v. FCC*, No. 14-1242, Order (D.C. Cir. Nov. 21, 2014) (Toller Reply Decl., Ex. 6) (granting emergency stay of disclosure where "[t]he agency has access to the relevant documents in this matter and can continue" its evaluation "during the stay"). A preliminary injunction would not prevent TURN or any other party from participating in the CPUC's proceeding, or from relying on public data. Indeed, TURN has acknowledged (Mot. to Compel at 11) that it is "currently relying on publicly available data." To the extent that the CPUC desires TURN's input based on the Form 477 data at issue, the CPUC is free to adjust its procedural schedule pending a decision on the merits by the Court. Defendants do not identify any concrete harm that would result from such an adjustment—nor could they, as the CPUC's Investigation revives a long-dormant proceeding from almost a decade ago.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to succeed on their claims that the May AC/ALJ Ruling directing the production of confidential data to TURN (and potentially other third parties) is preempted and violates the Fourth Amendment. At a minimum, Plaintiffs have shown "serious questions going to

the merits"—which, as Defendants concede (Br. at 12), is sufficient to require issuance of a preliminary injunction where, as here, the balance of hardships also tips in Plaintiffs' favor.

### A. Requiring Sharing of Form 477 Data With Third Parties Directly Conflicts With the FCC's Rules And Thus Is Preempted.

Much of Defendants' opposition is devoted to a straw man argument: defending the proposition that the CPUC has a state-law right to *collect* subscription and deployment data and other Form 477-type data. *See, e.g.*, Def. Br. at 1, 17. But that proposition is not disputed in this litigation.[2] This case is ***not*** about whether the CPUC can *obtain* Plaintiffs' competitively sensitive, confidential Form 477 data; the Plaintiff service providers have already produced that data to the CPUC, while requesting "Commission Only" treatment (as required by the FCC's rules and procedures). Rather, this case is about whether the CPUC can lawfully *compel* Plaintiffs to *share this data with third parties*, including TURN and others. Under the FCC's rules and procedures, the answer to that question is no.

As Plaintiffs have explained—and Defendants do not dispute—state commissions seeking Form 477 data must agree "that the requested data *will not be shared* with any individuals who are not direct employees of the [state commission]." Toller Decl., Ex. 2 (FCC's Form 477 Data-Sharing Agreement) (emphasis added). Beyond a cursory mention of the FCC's Form 477 Data-Sharing Agreement (*see* Def. Br. at 17), Defendants do not even acknowledge or attempt to distinguish that requirement. Nor do they dispute that it is binding on the CPUC. *See* 47 U.S.C. § 155(c)(3) (decisions of FCC staff issued on delegated authority "shall have the same force and effect" as decisions of the full FCC). Defendants similarly disregard the FCC regulation specifying that "provider-specific" Form 477 data (*i.e.*, the very data at issue here) may be released "to … [a] state commission" only "*provided that the state commission has protections in place that would preclude disclosure* of any confidential information." 47 C.F.R. § 1.7001(d)(4)(i) (emphasis added); *see also In re Providing Eligible Entities Access to Aggregate Form 477 Data*, 25 FCC

[2] As Plaintiffs explained in their opening brief (at 8-9), Plaintiffs asserted jurisdictional objections to the OII in their filings with the ALJ and CPUC. While Plaintiffs preserve those and other objections to the OII, it is not necessary to consider those issues here.

Rcd. 5059, 5069-70 ¶¶ 32, 34 (2010) ("safeguard[ing] the limited release of" aggregate Form 477 broadband data to state-designated federal grant recipients "through the issuance of a *non-negotiated and non-negotiable order*" and noting that, under that program, "*interested third parties have no right to review the data* and use that information to participate in any [FCC] proceeding") (emphases added).

Rather than confront these controlling FCC determinations and policies, Defendants seek refuge in the proposition that, as a "general" matter, courts should not lightly find preemption of state law (and thus require a "clear" or "explicit[]" statement of preemptive intent). Def. Br. at 12-14. But that argument misstates the relevant preemption principles. Because of "the long history of federal presence" in regulating telecommunications "the ordinary presumption against finding preemption does not apply." *Qwest Corp. v. Arizona Corp. Comm'n*, 567 F.3d 1109, 1118 (9th Cir. 2009) (quoting *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003)). There is also a "long history of federal presence in regulating" Form 477 data—a category of data the FCC *created*. Further, as *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000)—on which Defendants rely (Def. Br. at 19)—makes clear, the Supreme Court "has never before required a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists." Nor does "[a] pre-emptive regulation's force … depend on express congressional authorization to displace state law." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982).

This is a classic case of conflict preemption. Because the FCC has unequivocally stated that Form 477 data "will not be shared with" non-CPUC employees, the May AC/ALJ Ruling ordering Plaintiffs to disclose the *same* data to third parties under a claim of state-law authority directly conflicts with, and poses an obstacle to the fulfillment of, that federal policy. This forced-sharing directive therefore conflicts with federal law and is preempted. *See, e.g.*, *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178-79 (9th Cir. 2016).

Unable to avoid this conflict, Defendants erroneously contend that the relevant data is somehow not Form 477 data. Def. Br. at 17; TURN Opp. at 11. But Defendants themselves have repeatedly admitted that the data at issue is Form 477 data, including statements in the CPUC's OII and in multiple rulings of the assigned ALJ. *See, e.g.*, OII (Toller Decl., Ex. 3) at B-3 (Information

Request #6) ("All California broadband provider Respondents that *file Form 477 fixed broadband deployment and subscription data with the FCC*, and all Respondents with broadband affiliates that file such data, are *ordered to provide to the Commission a copy of all such reports filed with the FCC* during the last year."); ALJ's Final Protective Order Ruling (Toller Decl., Ex. 6) at 4-5 ("The OII asked the carriers to provide certain data about the deployment and subscription of their fixed wireline, fixed broadband, and mobile voice and broadband services, by providing that data as the carriers keep and submit it to the FCC in the bi-annual Form 477 reports"); *see also* TURN Br. at 8 ("The data at issue in Plaintiffs' Motion can be found in the Plaintiff carriers' filings before the [FCC] in what is commonly referred to as Form 477 reporting"); TURN Mot. to Compel at 3 (describing TURN's "attempt to get a complete set of Form 477 data for our analysis" and noting that "TURN sent an email to all 12 carriers clarifying that pursuant to the [ALJ's] April 1st Ruling TURN expected to receive the Commission Only Form 477 data"); Toller Reply Decl., Ex. 5 (collecting CPUC, ALJ, and TURN statements confirming that Form 477 data is at issue). Moreover, the ALJ has acknowledged that Form 477 data covers not only the information filed with the FCC on Form 477, but also the more granular data that the CPUC would require Plaintiffs to share with third parties. *See* Final Protective Order Ruling (Toller Decl., Ex. 7) at Appendix A.1 (referencing "Carrier Parties' Form 477 data for California, as submitted to FCC, and required pursuant to OII Information Requests 5-7, including the subparts of those Requests [*i.e.*, the subparts seeking more granular data]"); February ALJ Ruling (Toller Decl., Ex. 4) at 13 (referencing "the requirement that the carriers provide some of the Form 477 data on a more granular, i.e., census block, basis").

Nor can Defendants evade the FCC's rules and procedures by ordering the service providers to turn over their confidential information pursuant to the CPUC's asserted state-law authority, rather than by seeking the same information from the FCC. *See* Def. Br. at 17. Whether the CPUC possesses that authority under state law is irrelevant to the federal-preemption analysis. *See, e.g.*, *Qwest Corp.*, 567 F.3d at 1118 ("While Arizona law grants the [Arizona Corporation Commission] broad powers to make unbundling and pricing determinations, federal preemption restricts that power here."). An act prohibited under federal preemption principles "cannot be done by a state,

directly *or indirectly*." *Briscoe v. Bank of Commonwealth of Ky.*, 36 U.S. 257, 311 (1837) (holding that, since the state itself could not "coin money," it likewise could not "incorporate … individuals and authorize them to coin money," as "such an act would be as much a violation of the constitution") (emphasis added); *see also International Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987) (preempting liability for lawsuits under state law where "[t]he inevitable result of such suits would be that … States could do indirectly what they could not do directly"). Defendants cannot circumvent the FCC's directive that there will be no sharing with third parties by arguing that the *same* Form 477 data sought from the service providers is not really Form 477 data subject to the FCC's protections.

Contrary to Defendants' misunderstanding of conflict-preemption principles (*see* Def. Br. at 17-18), state law is preempted whenever it stands as an obstacle to the accomplishment of federal policies and objectives, including instances in which the state action would undermine a federal regulator's judgment regarding the appropriate balancing of competing policies. In *Farina v. Nokia Inc.*, for example, the Third Circuit held that a lawsuit against cell phone manufacturers asserting claims under state law was preempted because it stood as an obstacle to the accomplishment of federal policy—specifically, FCC guidelines regarding safe levels of radiofrequency radiation. 625 F.3d 97 (3d Cir. 2010), *cert. denied*, 132 S. Ct. (2011). Federal preemption principles must bar the lawsuit, the court held; otherwise, state law could be used "to second guess the FCC's conclusion on how to balance its objectives." 625 F.3d at 125; *see also Geier*, 529 U.S. at 866 (lawsuit premised on failure to provide airbags in cars was preempted because it "conflict[ed] with the objectives of" a Department of Transportation safety standard that struck a balance between safety measures).

These same preemption principles foreclose Defendants' attempt to displace the FCC's binding policy judgment here. Echoing the ALJ's reasoning (*see* Toller Decl., Ex. 6 at 9), Defendants maintain that "California should have its own regime of telecommunications and broadband data collection, *and its own confidentiality regimen to go with it*." Def. Br. at 15 (emphasis added). Indeed, Defendants assert that, under state law, they are "balanc[ing] transparency and robust public participation in its processes with the utilities' legitimate need to

protect proprietary, confidential, trade secret, and/or other 'business sensitive' information." *Id.* But *the FCC* has already performed that "balanc[ing]"—after carefully weighing the relevant interests—and Defendants may not substitute their own judgment for that of the FCC. *See Free v. Bland*, 369 U.S. 663, 666 (1962) ("The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.").[3]

Defendants further suggest that the FCC's rules may not apply because some of the CPUC's Information Requests (and TURN's largely duplicative data requests) call for even more granular information—at the census-*block* rather than census-*tract* level—than the FCC seeks in its Form 477.[4] Def. Br. at 1, 4-5. As an initial matter, that *post hac* rationalization created solely for litigation purposes is at odds with Defendants' prior statements. *See* Toller Reply Decl., Ex. 5 (collecting prior statements by the CPUC, ALJ, and TURN). More fundamentally, though, Defendants' theory is fatally flawed, as any forced sharing of such granular data would present *even greater* confidentiality concerns—creating an even more glaring conflict with the FCC's rules and objectives. The FCC has observed that the harms from disclosure of otherwise confidential data may be diminished where the data is *aggregated*. *See Modernizing the FCC Form 477 Data Program*, 28 FCC Rcd. 9887, 9922 n.207 (2013) ("*2013 Form 477 Order*"). Conversely, the more granular the data, the greater the confidentiality concerns. It thus defies logic to suppose that federal law expressly prohibits the sharing of Form 477 data at the census tract level, but affords no such protection to those same data in *even more sensitive* form (*i.e.*, at an even more granular, census-block level). And, in all events, any attempt by Defendants to force the sharing of this more

---

[3] This is true even if the ultimate goals of the FCC and CPUC are similar or even identical. State law is preempted not only when it stands as an obstacle to the accomplishment of federal objectives, but also when it interferes with the *methods* by which a federal law is designed to accomplish its objectives. *Qwest Corp.*, 567 F.3d at 1118.

[4] FCC Form 477 does in fact call for some data—deployment data for fixed broadband service—at the highly granular census block level. *See* FCC Form 477 Instructions at 12 (*available at* https://transition.fcc.gov/form477/477inst.pdf). Otherwise, Form 477 generally requires the reporting of subscription and deployment data at the census tract level. To the extent that the CPUC and TURN now seek non-public subscription and deployment data at the census block level, the federal policies underlying the FCC's rules apply with even greater force.

sensitive data would plainly stand as an obstacle to the accomplishment of the FCC's policies in preserving the confidentiality of sensitive information and likewise would be preempted. *See, e.g.*, *Farina*, 625 F.3d at 125; *Geier*, 529 U.S. at 866; *Qwest Corp.*, 567 F.3d at 1118.

Finally, and equally unavailing is the attempt by Defendants and TURN to avoid preemption by citing the FCC's ongoing review of its confidentiality rules. Def. Br. at 20; TURN Br. at 8-10. While the FCC is considering whether "greater access to [Form 477] subscription data *might be* feasible," *2013 Form 477 Order*, 28 FCC Rcd. at 9921 ¶ 78 (emphasis added), and has directed its staff to "explore ways to allow greater public access to Form 477 subscription data," *id.*, the FCC has made clear that the current framework remains in effect: "We *do not* expand public access to Form 477 data at this time." *Id.* at 9922 ¶ 80 (emphasis added); *see also id.* ¶ 79 ("Based on the record before us, we retain our existing procedures with respect to subscription data."). The FCC's current rules therefore remain binding law, and the CPUC may not usurp the authority the FCC has exercised through its staff. Because Defendants' forced-sharing mandate for Plaintiffs' Form 477 data clearly conflicts with those rules, it is preempted.

**B. The Fourth Amendment Likewise Bars Defendants from Enforcing the May AC/ALJ Ruling.**

The Fourth Amendment further guarantees Plaintiffs, like all other "subject[s] of an administrative search[,] … an opportunity to obtain precompliance review before a neutral decisionmaker." *City of L.A. v. Patel*, 135 S. Ct. 2443, 2452 (2015). Any effort by Defendants to compel Plaintiffs to disclose Form 477 data before judicial review on the merits would violate that guarantee and, therefore, be "unreasonable."

The Fourth Amendment also prohibits Defendants from compelling Plaintiffs to disclose Form 477 data to third parties. Defendant concede, as they must (Br. at 18), that the information sought is highly confidential, proprietary, and competitively sensitive to Plaintiffs. Under long-settled principles, an agency may not invade commercial privacy interests unless each of the following three conditions is satisfied: it has the authority to demand the information, "the demand is not too indefinite," and "the information sought is reasonably relevant." *Reich v. Montana Sulphur & Chem. Co.*, 32 F.3d 440, 448 (9th Cir. 1994) (quoting *United States v. Morton Salt Co.*,

338 U.S. 632, 652-53 (1950)); *see also See v. City of Seattle*, 387 U.S. 541, 544 (1967) (similar); *accord, Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003). Defendants' forced-sharing mandate violates the first and third of these requirements. This Court should, therefore, enjoin any effort to enforce it or any similar ruling pending a decision on the merits.

Defendants resist the reality that the Fourth Amendment bars a state agency from compelling a business to disclose private information even if it would serve no relevant purpose. *See* Def. Br. at 21. But it has been settled law for decades that "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power," at which point the Fourth Amendment bars the inquiry. *Morton Salt*, 338 U.S. at 652-53. While the court in *Reich* found that the Fourth Amendment's requirements were satisfied under the particular facts there, that holding in no way undercuts the settled principle on which *Reich* relied—and which likewise governs here. *Reich*, moreover, involved a government request to a single company following a specific complaint alleging hazardous workplace conditions. This case, by contrast, involves a sweeping, open-ended proceeding in which a government entity proposes to compel numerous participants to disclose highly confidential information to third parties.

By obtaining the May AC/ALJ Ruling granting its motion to compel, TURN has invoked the government-compelled production of private information, which triggers constitutional protections. *See Hawkins v. St. Clair Cnty.*, No. CIV. 07-142-DRH-CJP, 2008 WL 4279994, at *2 (S.D. Ill. Sept. 17, 2008) ("government compulsion [is] involved" when a court "order[s] compliance, enforceable by the Court's contempt powers," with a "discovery request"); *cf. Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987) (a court "order compelling discovery … provide[s] the requisite governmental action" to trigger constitutional scrutiny); *see generally* Chad DeVeaux, *A Tale of Two Searches: Intrusive Civil Discovery Rules Violate the*

*Fourth Amendment*, 46 Conn. L. Rev. 1083, 1092-1101 (2014) (compelled production of private papers constitutes a Fourth Amendment search).[5]

Those same protections foreclose enforcement of Defendants' forced-sharing mandate. As noted above, it is settled law that a government search without lawful authority violates the Fourth Amendment. *Reich*, 32 F.3d at 448. And, as Plaintiffs have shown (Point II.A, *supra*), Defendants' mandate directly conflicts with and undermines federal rules and policies. It follows that Defendants lack lawful authority to mandate the sharing of Form 477 data in violation of federal law—thereby infringing Plaintiffs' Fourth Amendment rights, at a minimum by forcing Plaintiffs to divulge their confidential data prior to a final judicial decision on the merits of their claims.

The Fourth Amendment also condemns Defendants' forced sharing of Form 477 data for a separate reason: The specific information requested—which pertains to broadband, VoIP, and wireless services—is not reasonably relevant to the CPUC's inquiry into rates for *traditional landline telephone service* (which is the central focus of the CPUC's Investigation and the only service over which the CPUC has ratemaking jurisdiction). Nor can Defendants credibly claim that requiring Plaintiffs to share this granular, disaggregated Form 477 data with third parties, including TURN—rather than treating it as "Commission Only"—fairly relates to the CPUC's stated purpose in the Investigation. As for TURN, the sole justification it gives (Br. at 5-6) for needing this highly confidential information is that it wants to calculate market concentration under the Herfindahl-Hirschman Index ("HHI"). But the CPUC has the data and can conduct an HHI analysis—if it were to find such an analysis useful, a dubious proposition—while third parties, including TURN, can urge the CPUC do so and offer comments on the proper geographic and product market definitions. It is not "reasonable" within the Fourth Amendment's meaning to compel Plaintiffs to disclose this data to third parties merely so that they may *each* conduct an HHI analysis for broadband, VoIP, and wireless service, in a proceeding that is supposed to be about traditional telephone service.

---

[5] *Lewis v. Younger*, 653 F.2d 1258 (9th Cir. 1980), to which Defendants point (Br. at 22), does not require a contrary result. That case neither mentions the Fourth Amendment nor quotes (or even cites) the portion of *Morton Salt* that discusses the Fourth Amendment.

## III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

If Defendants' forced-sharing mandate is not enjoined, Plaintiffs will be forced to disclose their highly confidential Form 477 information to third parties, which would effectively deprive Plaintiffs of a judicial determination of the merits of their claims. Once Plaintiffs produce the data, "the cat is out of the bag," *CBS*, 785 F.3d at 708 (quotation marks omitted), and there is no way to claw back the information learned by the third parties recipients. A preliminary injunction is therefore necessary "to minimize the risk that a litigant will suffer an irreparable loss of legal rights in the period before final resolution of the dispute." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984); *see also Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988) ("The basic function of a preliminary injunction is to preserve the *status quo* pending a determination of the action on the merits."). Plaintiffs' ability to seek vindication of their Fourth Amendment rights would be lost if they are forced to comply with the mandate to disclose their Form 477 data before this Court adjudicates the merits. "Violation of a constitutional right in, and of itself, constitutes irreparable injury." *Napa Valley Publ'g Co. v. City of Calistoga*, 225 F. Supp. 2d 1176, 1182 (N.D. Cal. 2002).

Neither Defendants nor TURN addresses the fundamental point that the Form 477 data, once disclosed, cannot be re-sheathed in the "Federal confidentiality statutes and rules" protecting that information. Toller Decl., Ex. 2 (FCC's Form 477 Data-Sharing Agreement). Nor can Defendants or TURN dispute that this injury would remain unremedied *even if the Plaintiffs were ultimately to prevail on the merits*, because the third-party recipients would already have seen what federal law forbids them from seeing. Rather than confronting the irreparable harm Plaintiffs face, Defendants fall back upon the claim that disclosure of the information would be unlikely to cause "competitive harm." Def. Br. at 22-23. For its part, TURN asserts that it will comply with the CPUC's protective order. TURN Br. at 13. But those arguments miss the point. Plaintiffs' interest is in obtaining a decision from this Court on the merits of their federal claims *before disclosure*, and Plaintiffs will be irreparably harmed if the status quo is not preserved in the interim.

In the context of commercially sensitive data, the FCC "has long recognized that confidential information should remain confidential until the merits of a disclosure decision have been fully resolved." *CBS*, 785 F.3d at 708. Because the bell cannot be unrung, enjoining disclosure pending judicial review is the only way to prevent the irreparable harm of a disclosure that is later found to have violated a party's rights. *See id.* (judicial review of a disclosure order is "effective only if it occurs before confidential information is disclosed to third parties").

Defendants' attempts to distinguish *CBS* are meritless. First, Defendants suggest that the problem identified in *CBS* was merely that the FCC had failed to follow its own policies and regulations. Def. Br. at 24. But the policy that the FCC had failed to follow "always allowed aggrieved parties to seek review at the agency level *and, if necessary, by a court*—all before the [FCC staff] could disclose the information." 785 F.3d at 708 (emphasis added). The D.C. Circuit was concerned not merely with a procedural irregularity, but with an agency decision that threatened to defeat the judicial-review safeguard for disclosure of commercially sensitive information. Second, Defendants note that the entities contesting disclosure in *CBS* case had not "signed up for" the proceeding. Def. Br. at 24. But the same is true here. Plaintiffs did not volunteer to participate in the CPUC's proceeding, let alone have their commercially sensitive information disclosed to third parties in violation of the FCC's binding rules and policies.

As shown above, the FCC has already struck the balance specifying which parties should have access to this information, and it decided that *no* third parties should receive the data from state agencies. The FCC did not distinguish between parties representing consumer interests, like TURN, and parties representing commercial interests. Its requirements for how state entities handle sensitive provider data more broadly serve "to minimize the risk of inappropriate or inadvertent disclosure of the competitively sensitive information." *Providing Eligible Entities Access to Aggregate Form 477 Data*, 25 FCC Rcd. at 5059-60 ¶ 2; *see also id.* at 5069 ¶ 31 (highlighting the risk of "inadvertent disclosure of confidential Form 477 data to third parties"); *id.* at 5070 ¶ 34 (a "traditional protective order" would "not be appropriately tailored" to protecting Form 477 data); *In re Special Access for Price Cap Local Exchange Carriers*, 29 FCC Rcd. 11657, 11663 ¶ 18 (2014) ("the risk of harm resulting from inadvertent disclosure" is not cured by a

protective order). Plaintiffs need not demonstrate that TURN will disclose the Form 477 data in a way that will result in commercial harm to Plaintiffs because the inherent risk of even inadvertent disclosure led the FCC to prohibit states from providing such data to any third party. And the FCC has insisted that the "higher federal standard will prevail" if, as in this case, "state laws afford less protection than federal FOIA laws." *In re Local Competition & Broadband Reporting*, 15 FCC Rcd. 7717, 7761 ¶ 95 (2000); *accord*, Toller Decl., Ex. 2 (Form 477 Data-Sharing Agreement).

The FCC's *Special Access* proceeding underscores that the FCC does not regard the mere signing of an acknowledgement of confidentiality as sufficient. While Defendants claim to have modeled their Protective Order on that adopted by the FCC in the *Special Access* proceeding (*see* Def. Br. at 8), the FCC in fact established important additional protections for sensitive information that the CPUC has failed to implement. First, under the FCC's protocol, if a provider objects to disclosure of confidential information to any other party, the FCC does not permit the third party to access the information "until any objection is resolved by the Commission and, if appropriate, by any court of competent jurisdiction." *In re Special Access*, 29 FCC Rcd. 11657, 11673, App. A. ¶ 5. The CPUC's Protective Order, by contrast, contains no provision for pre-disclosure judicial review. Toller Decl., Ex. 7 (Initial Protective Order Ruling, attaching Protective Order (¶ 5)). Second, in the *Special Access* proceeding, the FCC permits third parties to access certain highly sensitive provider information only at a secure data enclave, and the reviewing parties "may not download, print out or otherwise remove" any information from that secure enclave. *Id.* at 11673, App. A ¶ 6. The FCC found that these additional restrictions were needed because "the risk of harm resulting from inadvertent disclosure is significantly greater than is typically the case in [an FCC] proceeding" in which a more typical protective order is used. *Id.* at 11676, App. A ¶ 18.[6]

[6] Because inadvertent disclosure is—by definition—unintended, Defendants' assurances (*see* Def. Br. at 8-9) that the potential availability of sanctions for violations of the Protective Order will be sufficient provide cold comfort to Plaintiffs. Indeed, TURN (Br. at 11) essentially concedes that the current Protective Order falls short: "[I]f Plaintiffs are concerned that the CPUC's current protections do not go far enough to protect the confidentiality of the data under the Rules, then *the solution is to revise the Protective Order to provide further protections for the data*." (Emphasis added.) Because the Assigned Commissioner and ALJ have ordered production to TURN and potentially other third parties subject to the current Protective Order, a preliminary injunction is needed even if a better protective order could be crafted. Plaintiffs' principal argument, however,

The CPUC's Protective Order here, by contrast, contains no such safeguards, and thus creates a significantly increased risk of inadvertent disclosure.

For these reasons, the argument that TURN did not release certain Form 477 information it received in other proceedings is beside the point. *See* Def. Br. at 23; TURN Br. at 15. Plaintiffs' irreparable injury does not depend on proving that TURN has in the past or will in the future disseminate sensitive data; the compelled disclosure of that data to TURN itself causes irreparable harm by violating Plaintiffs' legal rights in a way that cannot be corrected after the fact. In addition, as the FCC has found, any disclosure—and particularly one that permits the recipient to download or print the information—inherently risks inadvertent disclosure. These risks are magnified in the context of this industry-wide proceeding. Defendants' forced-sharing mandate is not limited to TURN, but entitles any party—including competitors—that signs the acknowledgment of confidentiality to receive the same Form 477 data. *See* May AC/ALJ Ruling (Toller Decl., Ex. 8) at 4 & n.3 (discussing production of data "to TURN (and presumably other qualified parties)" who have executed an acknowledgement); Final Protective Order Ruling (Toller Decl., Ex. 6) at 12 (indicating that CalTel—a trade association that represents competitors—may seek access to the information by executing such an acknowledgement); Toller Reply Decl. ¶¶ 2-3 (describing acknowledgements filed by third parties other than TURN, and CalTel's and Sprint's interest in accessing Form 477 data). Making matters worse, if TURN (or any other party) obtains access to data from Plaintiffs, and if TURN (or any other party) uses such data to support its submissions to the CPUC, the Plaintiff service providers will be left in an untenable position. They can either try to rebut those arguments without seeing all the supporting data, or they will have to request access to one another's data, which would dramatically increase the number of parties with access and the risk of inadvertent disclosure.

Contrary to Defendants' and TURN's suggestions (Def. Br. at 22-23; TURN Br. at 15), the fact that some entities voluntarily produced certain Form 477 data in different regulatory proceedings does not waive their right to object to the compelled production of the same (or other)

---

is that Defendants are preempted from compelling disclosure to third parties, and no protective order, however crafted, can alter that conclusion.

data in this proceeding, much less waive the rights of other Plaintiffs to assert such objections. First, the data provided in those other proceedings was narrower than the data at issue here. For example, Verizon California produced certain Form 477 data in the proceeding seeking CPUC approval for the sale of that entity to Frontier. That transaction has now closed, and the entity formerly known as Verizon California is no longer affiliated with the Verizon entities that are Plaintiffs (Verizon Wireless and Verizon Business), nor was any Form 477 data of those Plaintiffs produced in that prior proceeding. *See* Reply Declaration of Dulaney O'Roark ¶¶ 4-5; *see also* Reply Declaration of Suzanne Toller ¶ 4 (discussing Comcast's limited production of less granular information than the data demanded by the CPUC's OII). Second, the willingness of those parties to accede to the CPUC's insistence on sharing that data with third parties—in an effort to facilitate the approval of time-sensitive commercial transactions—is hardly a precedent that authorizes the CPUC to compel *all* parties to this proceeding to share more extensive and more granular data with third parties. The contrast, and lack of precedent, is even sharper where, as here, the CPUC has not substantiated the need to rush the schedule of its Investigation.

## IV. THE BALANCE OF EQUITIES FAVORS PLAINTIFFS AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

In stark contrast with the imminent and irreparable harm to Plaintiffs resulting from a forced disclosure (as shown above), Defendants face no possible harm to their Investigation if the preliminary injunction is granted. The CPUC itself already has all the Form 477 data at issue and can continue its own analysis now regardless of what the Court does here. *Cf. CBS Corp. v. FCC*, No. 14-1242, Order (D.C. Cir. Nov. 21, 2014) (Toller Reply Decl., Ex. 6) (stay of disclosure of confidential data granted where "[t]he agency has access to the relevant documents in this matter and can continue" its evaluation "during the stay"). Moreover, to the extent the CPUC believes its Investigation would be harmed by TURN and other parties not being able to review the Form 477 data, it can readily avoid such harm by adjusting the Investigation's schedule or by continuing on the current schedule but (if necessary) allowing supplemental comments by TURN and others following this Court's decision on the merits.

TURN claims that it will be harmed by the delay it speculates will occur—due to the supposed "urgency" of its need for Plaintiffs' data (*see* TURN Br. at 21-22)—but neither Defendants' opposition here nor the underlying CPUC orders mention any urgency. Nor would any such claim be plausible. The CPUC has reopened a proceeding to rehear a decision from 2008 (OII at 1, 6), and the CPUC has not yet even decided the precise scope of the Investigation. *See* Transcript of January 20, 2016 OII Prehearing Conference, at 81 ("I'm not ready to say exactly what we're going to do [in this proceeding]. That is what the scoping memo is about.") (statement of Assigned Commissioner Peterman). Indeed, there is no fixed date for an order defining the scope of the Investigation (the original date having passed), and all dates following such an order remain undetermined. OII at 17.

TURN also asserts (Br. at 20-22) that it faces harm in presenting its position without access to Form 477 data, but that is premature. At this stage, the only question is potential harm from temporary delay during the preliminary injunction. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (in balancing equities, the Court "must consider only the portion of the harm that would occur while the preliminary injunction is in place[.]"). And the Ninth Circuit has recognized that, where "the harms [the plaintiffs] face are permanent," even where defendants or intervenors "face temporary delay," the "balance of equities tips toward" granting a preliminary injunction. *League of Wilderness Defenders*, 752 F.3d at 765. That is the case here.

Aside from speculative delay, TURN does not and could not identify any specific harm from preserving the status quo for a short while to resolve important preemption and Fourth Amendment issues. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1026, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available.") (citation and internal quotation marks omitted); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (it is "always" in the public interest to prevent the deprivation of constitutional rights; addressing Fourth Amendment claim). If TURN ultimately defeats a permanent injunction, it will have access

to the Form 477 data and can make use of it then. But, at this stage, the balance of harms decisively supports a preliminary injunction.

## V. CONCLUSION

Plaintiffs respectfully submit that the Court should issue a preliminary injunction enjoining enforcement of the May AC/ALJ Ruling and any similar ruling, order, or directive that requires any of Plaintiffs, or any of Plaintiffs' affiliates, to disclose their Form 477 data or more granular breakdowns of such data to third parties (including, but not limited to, TURN).

Dated: May 14, 2016.

Respectfully Submitted,

By: /s/ *Martin L. Fineman*

Martin L. Fineman
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
Telephone: (415) 276-6500
E-mail: martinfineman@dwt.com

PETER KARANJIA (Appearance *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006-3401
Tel: (202) 973-4256
E-mail: peterkaranjia@dwt.com

*Attorneys for Comcast Phone of California, LLC*

MICHAEL K. KELLOGG (Appearance *pro hac vice*)
SCOTT HARRIS ANGSTREICH (Appearance *pro hac vice*)
KELLOGG HUBER HANSEN TODD EVANS & FIGEL, P.L.L.C.
1615 M STREET, N.W., SUITE 400
WASHINGTON, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
Email: mkellogg@khhte.com
sangstreich@khhte.com

MATTHEW H. MARMOLEJO (SBN 242964)
MAYER BROWN, LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel: (213) 229-9500
Email: mmarmolejo@mayerbrown.com

CHRISTIAN F. BINNIG (Appearance *pro hac vice*)
J. TYSON COVEY (Appearance *pro hac vice*)
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
Email: cbinnig@mayerbrown.com

ISABELLE SALGADO (SBN 142313)
GREGORY L. CASTLE (SBN 111404)
DAVID P. DISCHER (SBN 121218)
DAVID J. MILLER (SBN 161201)
AT&T SERVICES, INC.
2150 Webster Street, 8th Floor
Oakland, CA 94612
Tel: (510) 645-4581
Email: gc1831@att.com

***Attorneys for Plaintiffs New Cingular Wireless PCS, LLC d/b/a AT&T Mobility and Pacific Bell Telephone Company d/b/a AT&T California***

LESLA LEHTONEN (SBN 95619)
CALIFORNIA CABLE & TELECOMMUNICATIONS ASSOCIATION
1200 K Street
Sacramento, CA 95814
Tel: (916) 446-7732
Email: Lesla@calcable.org

***Attorneys for Plaintiff California Cable & Telecommunications Association***

SUZANNE TOLLER (SBN 129903)
MARTIN L. FINEMAN (SBN 104413)
ZEB ZANKEL (SBN 298919)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
Tel: (415) 276-6500
Email: suzannetoller@dwt.com

PETER KARANJIA (Appearance *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006-3401
Tel: (202) 973-4256
Email: peterkaranjia@dwt.com

***Attorneys for Comcast Phone of California, LLC***

MARGARET L. TOBIAS (SBN 191022)
TOBIAS LAW OFFICE
460 Pennsylvania Ave
San Francisco, CA 94107
Tel: (415) 641-7833
Fax: (415) 641-7099
Email: marg@tobiaslo.com

REES F. MORGAN (SBN 88049)
RICHARD RALPH PATCH (SBN 229899)
COBLENTZ, PATCH, DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Tel: (415) 391-4800
Email: ef-rfm@cpdb.com
ef-rrp@cpdb.com

***Attorneys for Cox California Telcom, LLC***

HENRY WEISSMANN (SBN 132418)
FRED A. ROWLEY, JR. (SBN 192298)
THANE M. REHN (SBN 296197
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 683-9150
Email: henry.weissmann@mto.com

***Attorneys for Plaintiff Cellco Partnership d/b/a Verizon Wireless and MCI Communications Services, Inc.***

MICHAEL B. DAY (SBN 70604)
GOODIN, MACBRIDE, SQUERI & DAY LLP
505 Sansome Street, Suite 900
San Francisco, CA 94111
Tel: (415) 392-7900
Email: Mday@goodinmacbride.com

***Attorneys for Plaintiff CTIA-The Wireless Association®***